Filed 3/2/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| In re WILLIAM TAYLOR et al. | ) | |
| | ) | |
| on Habeas Corpus. | ) | S206143 |
| | ) | |
| | ) | Ct.App. 4/1 D059574 |
| | ) | |
| | ) | San Diego County |
| | ) | Super. Ct. Nos. HC19743, HC19742, |
| | ) | HC19731, HC19612 |
| _____ | ) | |

On November 7, 2006, the voters enacted Proposition 83, the Sexual Predator Punishment and Control Act: Jessica's Law (Prop. 83, as approved by voters, Gen. Elec. (Nov. 7, 2006); hereafter Prop. 83 or Jessica's Law).  "Proposition 83 was a wide-ranging initiative intended to 'help Californians better protect themselves, their children, and their communities' (*id*., § 2, subd. (f)) from problems posed by sex offenders by 'strengthen[ing] and improv[ing] the laws that punish and control sexual offenders' (*id.*, § 31.)"  (*In re E.J.* (2010) 47 Cal.4th 1258, 1263 (*E.J.*).)

Among its proponents' objectives, Jessica's Law sought to "prevent sex offenders from living near where our children learn and play" by creating "predator free zones around schools and parks" (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) argument in favor of Prop. 83, p. 46, capitalization & italics omitted) through the enactment of mandatory residency restrictions in the form of an amendment to Penal

1

Code section 3003.5.[1]  Section 3003.5, a preexisting law codified among statutes dealing with parole, already set forth certain restrictions on where and with whom certain paroled registered sex offenders may live.  The initiative added new subdivision (b) to section 3003.5, making it "unlawful for any person for whom registration is required pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather."  (§ 3003.5, subd. (b), added by Prop. 83, § 21, subd. (b) (§ 3003.5(b) or, generally, residency restrictions)),; see *E.J., supra,* 47 Cal.4th at p. 1266.)  Subsequently, as relevant here, the California Department of Corrections and Rehabilitation (CDCR) began enforcing the residency restrictions as a mandatory parole condition for all registered sex offenders on parole in San Diego County.

Petitioners in this consolidated habeas corpus proceeding were registered sex offenders on active parole in San Diego County against whom section 3003.5(b) was enforced.  Petitioners alleged the residency restrictions, as applied to them, are unconstitutional.  At the conclusion of an evidentiary hearing ordered by this court, the trial court agreed with petitioners' arguments, finding the mandatory residency restrictions unconstitutional as applied to all registered sex offenders on parole in San Diego County, and enjoining enforcement of the statute in the county.  At the same time, however, the trial court concluded parole authorities retain the statutory authority to impose special parole conditions on sex offender parolees, including residency restrictions, as long as they are based on the specific circumstances of each individual parolee.  The Court of Appeal affirmed.

As will be explained, we agree that section 3003.5(b)'s residency restrictions are unconstitutional as applied across the board to petitioners and similarly situated registered sex offenders on parole in San Diego County.  Blanket enforcement of the residency restrictions against these parolees has severely restricted their ability to find

---

[1]     All further statutory references are to the Penal Code.

2

housing in compliance with the statute, greatly increased the incidence of homelessness among them, and hindered their access to medical treatment, drug and alcohol dependency services, psychological counseling and other rehabilitative social services available to all parolees, while further hampering the efforts of parole authorities and law enforcement officials to monitor, supervise, and rehabilitate them in the interests of public safety. It thus has infringed their liberty and privacy interests, however limited, while bearing no rational relationship to advancing the state's legitimate goal of protecting children from sexual predators, and has violated their basic constitutional right to be free of unreasonable, arbitrary, and oppressive official action.

Nonetheless, as the lower courts made clear, CDCR retains the statutory authority, under provisions in the Penal Code separate from those found in section 3003.5(b), to impose special restrictions on registered sex offenders in the form of discretionary parole conditions, including residency restrictions that may be more or less restrictive than those found in section 3003.5(b), as long as they are based on, and supported by, the particularized circumstances of each individual parolee.

Accordingly, we will affirm the judgment of the Court of Appeal.

**PROCEDURAL AND FACTUAL BACKGROUND**

**A. *The habeas corpus proceedings initiated in E.J.***

In *E.J.*, *supra*, 47 Cal.4th 1258, four registered sex offenders on parole in various counties for offenses committed before the passage of Proposition 83, but who were thereafter released on parole, filed a unified petition for habeas corpus challenging the constitutionality of section 3003.5(b)'s residency restrictions when enforced as a mandatory parole condition by CDCR. (*E.J.*, at pp. 1263-1264.) After issuing orders to show cause, we rejected two facial challenges to the constitutionality of the statute, finding that the residency restrictions, when so enforced, were neither impermissibly

3

retroactive nor in violation of the state or federal constitutional prohibitions against ex post facto laws. (*Id*. at pp. 1264, 1272, 1280.) **2**

The *E.J.* petitioners further claimed that "section 3003.5(b) is an unreasonable, vague and overbroad parole condition that infringes on various state and federal constitutional rights, including their privacy rights, property rights, right to intrastate travel, and substantive due process rights under the federal Constitution." (*E.J.*, *supra*, 47 Cal.4th at p. 1280.) In support of these claims, they appended declarations and various materials as exhibits to their petition in an effort to establish a factual basis for each claim. CDCR, in its return, denied many of the allegations advanced in the petition in reliance on such exhibits, and disputed the authentication of several of petitioners' exhibits. In their traverse, petitioners alleged the new residency restrictions made entire cities off-limits to registered sex offenders on parole, and that the restrictions were " 'so unreasonably broad' as to leave those to whom [they apply] 'with no option but prison or homelessness.' " (*E.J., supra,* at p. 1281.)

We observed in *E.J.* that the petitioners were "not all similarly situated with regard to their paroles," as they had been "paroled to different cities and counties within the state," and that "the supply of housing in compliance with section 3003.5(b) [and] available to them during their terms of parole—a matter critical to deciding the merits of their [claims]—[was] not sufficiently established" by the declarations and materials to permit this court to decide the claims. (*E.J., supra*, 47 Cal.4th at p. 1281.)

The *E.J.* petitioners also alleged that the *manner* in which CDCR had enforced Jessica's Law constituted further evidence that the law was operating against registered sex offender parolees in an unconstitutional way. The matter of whether CDCR and, in

---

**2**     The further question whether section 3003.5(b) also creates a separate misdemeanor offense subject to violation by registered sex offenders who are not on parole was not before us in *E.J.* (*E.J., supra*, 47 Cal.4th at p. 1282, fn. 10) and is likewise not before us here.

4

particular, its Division of Adult Parole Operations (DAPO), are obligated by law to identify "compliant housing" for petitioners or otherwise assist them in locating and securing such housing was sharply disputed in the parties' pleadings. (*E.J., supra,* 47 Cal.4th at p. 1282.) In support of their allegation that " '[r]espondent has provided little to no assistance to individual parolees attempting to find compliant housing,' " the petitioners pointed to the initial CDCR policy statement (CDCR, Policy No. 07-36: Implementation of Prop. 83, aka Jessica's Law (Aug. 17, 2007); hereafter Policy No. 07-36) that provided " '[t]he responsibility to locate and maintain compliant housing shall ultimately remain with the individual parolee through utilization of available resources.' " (*E.J.*, at p. 1283). Petitioners asserted that they, and other parolees, " 'had not been informed of areas in their counties where compliant housing [might] be found.' " (*Ibid.*) CDCR, in turn, denied " 'the allegation that it provides "little to no assistance to individual parolees attempting to find compliant housing," [claiming] it does provide such assistance.' " (*Ibid.*)

We noted that these claims, unlike the retroactivity and ex post facto contentions, were "considerably more complex 'as applied' challenges" to the residency restrictions (*E.J., supra,* 47 Cal.4th at p. 1281), and that the evidentiary record before us was insufficient to decide them. Accordingly, we remanded the cases for evidentiary hearings in the trial courts of the various counties to which the *E.J.* petitioners had been paroled. (*Id.,* at p. 1284.) We further outlined an agenda for finding the relevant facts necessary to decide the petitioners' claims at these hearings. The issues, we stated, should "include, but . . . not necessarily [be] limited to, establishing each petitioner's current parole status; the precise location of each petitioner's current residence and its proximity to the nearest 'public or private school, or park where children regularly gather' (§ 3003.5(b)); a factual assessment of the compliant housing available to petitioners and similarly situated registered sex offenders in the respective counties and communities to which they have been paroled; an assessment of the way in which the mandatory parole residency

restrictions are currently being enforced in each particular jurisdiction; and a complete record of the protocol CDCR is currently following to enforce section 3003.5(b) in those respective jurisdictions." (*E.J., supra,* at pp. 1283-1284.)

Two of the four petitioners in *E.J.* were from San Diego County; the remand of their cases to that county for an evidentiary hearing gave rise to the instant consolidated habeas corpus proceeding. By May 2010, however, the two San Diego *E.J.* petitioners had been discharged from parole and their cases dismissed as moot. Meanwhile, more than 150 other registered sex offender parolees filed habeas corpus petitions in the San Diego County Superior Court, and were granted temporary stays of the enforcement of section 3003.5(b) as to them pending resolution of this matter. The parties agreed that the petitions of four of these parolees — William Taylor, Stephen Todd, Jeffery Glynn, and Julie Briley — would serve as the representative cases for purposes of the evidentiary proceedings contemplated in *E.J., supra,* 47 Cal.4th 1258.

On February 18, 2011, the evidentiary hearing commenced in the San Diego County Superior Court. The following facts, drawn in large part from the opinion of the Court of Appeal, were established with regard to the circumstances of the four representative petitioners, the manner in which CDCR was enforcing the statute in San Diego County, and the general unintended and socially deleterious effects of such enforcement in that county.

**B.** *Petitioners' respective parole and residential statuses*

**1.** *William Taylor*

William Taylor was paroled in January 2008 after serving a sentence for failing to register as a sex offender. (§ 290.) He is required to register as a result of his conviction of sexual assault in Arizona in 1991, which was determined to be the equivalent of a rape conviction under California law. (§§ 261, subd. (a)(2), 290.005.) The victim in that case was an adult woman. Although Taylor has a long criminal history, he has never been convicted of another sex crime or a crime involving a child victim.

6

Taylor suffers from numerous illnesses, including throat cancer, AIDS, and diabetes. He has had a heart attack and several strokes, suffers from chronic depression and paranoid schizophrenia, and is addicted to cocaine. He had planned to live in Spring Valley with relatives, one of whom is a health care professional, but could not do so because the location of their residence is not compliant with the residency restrictions of section 3003.5(b). Taylor's parole agent was unable to obtain financial assistance for his housing. Subsequently, he slept outside in an alley behind the parole office, a location pointed out to him by his parole agent, and remained homeless for a month until arrested for using cocaine. Upon his rerelease on parole, he was admitted to the Etheridge Center, a residential drug treatment program near downtown San Diego and near the clinic where he was receiving treatment for AIDS. However, the location of the Etheridge Center is not compliant with the residency restrictions of section 3003.5(b). Taylor's application for a waiver of the 2,000-foot restriction was denied by CDCR, whereafter, on October 2, 2009, the court issued him an emergency 120-day stay, enjoining CDCR from requiring him to leave the Etheridge Center unless alternative accommodations for medical treatment could be arranged.

Shortly thereafter Taylor was suspended from the Etheridge Center for nonsexual misconduct, was rearrested for another parole violation, was rereleased on parole and remained homeless for several weeks, and was then placed in a boarding house in Vista by CDCR, which was a three-hour bus ride from his parole office, his outpatient clinic, and the medical facility that agreed to provide his medical care. While in the Vista facility, Taylor collapsed and was hospitalized in the intensive care unit. His parole agent warned Taylor he would be arrested if did not register the hospital address with local authorities within five days. Taylor's parole was revoked for not registering the hospital address and for possession of drug paraphernalia. Upon his rerelease on parole, Taylor lived in a compliant hotel with the CDCR paying the rent for 60 days. At the time of the evidentiary hearing, Taylor was living in the hotel.

7

## 2. *Jeffrey Glynn*

In 2009, Jeffrey Glynn was released on parole after serving a sentence for a theft-related crime. He is required to register as a sex offender due to his conviction, in 1989, of misdemeanor sexual battery (§ 243.4) committed against an adult woman. That conviction is his only sex crime, although he has numerous convictions for theft- and drug-related offenses.

Glynn planned to live with his wife and their children when he was paroled, but the location of the family's residence was not compliant with the residency restrictions of Jessica's Law. Glynn's wife did not want to move, and he was unable to find compliant housing in the area, so he purchased a van and lived in it as a transient. In December 2009, the court granted Glynn's motion for a temporary injunction enjoining enforcement of the residency restrictions against him. However, one week earlier, Glynn had committed a burglary. When Glynn was paroled again in August 2010, he moved into the family's noncompliant apartment under the previously issued injunction and was living there at the time of the evidentiary hearing.

## 3. *Julie Briley*

In April 2009, Julie Briley was released on parole after serving a prison term for failing to register as a sex offender. She is required to register due to her conviction, in 1988, of committing a lewd and lascivious act on a child under the age of 14 years. (§ 288, subd. (a).) The victim was Briley's daughter and the crime occurred inside the family residence. Since then, Briley has suffered no new sex offense convictions, but has numerous convictions for drug offenses and failing to register as a sex offender.

Briley had planned to live with her sister upon her release, but the location of her sister's residence is not compliant with the 2,000-foot residency restrictions.[3] The

---

[3] Briley would not have been able to live with her sister in any event because a different condition of her parole prohibits her from having contact with children and Briley's nephew, a minor, lives with her sister.

8

restrictions also prevented Briley from living with her sister-in-law or in any of the shelters or sober living houses for women with an available bed. After learning from a parole agent that other homeless parolees slept in an alley near the parole office, Briley began sleeping there, along with 15 to 20 other persons. Briley, who has hepatitis C, high blood pressure, thyroid problems and osteoarthritis that is aggravated by exposure to cold temperatures, lived there for approximately one and one-half years.

In July 2009, the court granted Briley a temporary injunction against enforcement of the residency restrictions as a condition of her parole, but she was unable to find affordable housing until November 2010. At the time of the evidentiary hearing, Briley lived in a recreational vehicle parked at a noncompliant location in return for five hours of work each week. She has two other part-time jobs, which together pay her approximately $250 a month.

### 4. *Stephen Todd*[4]

In June 2008, Stephen Todd was released on parole after serving a prison term for drug possession. He is required to register as a sex offender after the juvenile court found, in 1981, when he was 15 years old, that he committed a lewd and lascivious act with a child under 14 years old by molesting his 10-year-old sister. (§§ 288, subd. (a), 290.008.) Todd does not have any other sex crime convictions or convictions of crimes involving children, although his lengthy criminal history includes convictions for assault with a deadly weapon, burglary, vehicle theft, receiving stolen property and drug offenses. Todd suffers from bipolar disorder, is diabetic and subject to seizures, is a recovering heroin addict, and has been addicted to methamphetamine for 18 years. Upon his release on parole he planned to stay with a friend at the Plaza Hotel in downtown San

---

[4] At the time of the evidentiary hearing, Todd was no longer on parole, as he had been returned to prison following his conviction for a new drug offense. The court and parties agreed his petition should not be dismissed as moot because of the original agreement to hear the four cases as a representative range of cases in San Diego County.

Diego, the location of which was not compliant with the residency restrictions. Unable to find compliant housing, Todd followed his parole agent's suggestion that he live in the riverbed of the San Diego River. Over the next one and one-half years, Todd was arrested and his parole revoked numerous times for violating various parole conditions. Throughout that time, Todd was homeless except for the periods he was in custody. By the time of the evidentiary hearing, Todd had suffered another drug conviction and been returned to prison.

**C.** *The availability of compliant housing in San Diego County*

In June 2006, Julie Wartell, a contract crime analyst for the San Diego County District Attorney's Office, used an automated mapping program to prepare an electronic map depicting the expected effect of the residency restrictions of Jessica's Law on available housing in San Diego County. Wartell mapped the location of all public and private schools, kindergarten through 12th grade, and all active parks (see San Diego County, Code of Reg. Ords., tit. 8, div. 10, ch. 1, § 810.102, subd. (a)) in the county. Then, using data from the tax assessor's office showing the location of residential land parcels throughout the county, she drew shaded circles around each school and park on the map to reflect the 2,000-foot buffer zones around each such location. Thus, Wartell's map showed locations that were not compliant with the residency restrictions; residences within the shaded circles or buffer zones were noncompliant and unavailable to paroled registered sex offenders.

In 2010, Wartell twice updated her analysis and map to reflect recent additions of parks and schools in the county. Two analysts with the San Diego County Department of Planning and Land Use then refined Wartell's work into a 288-page map book and an online map application, both of which allow a person to view specific areas in much greater detail. In its statement of decision, the trial court stated the map "graphically show[s] huge swaths of urban and suburban San Diego, including virtually all of the downtown area, completely consumed by the [residency] restrictions."

10

The trial court further found that sex offender parolees are unlikely candidates to rent single-family homes and are most likely to seek out housing in apartments or low-cost residential hotels. Wartell's research showed that if single-family residences are eliminated from all the compliant residential parcels in San Diego County, the percentage of multifamily parcels that are compliant with the residency restrictions is less than 3 percent (2.9 percent). David Estrella, then the Director of the San Diego County Department of Housing and Community Development, testified that at the time of the evidentiary hearing the countywide vacancy rate for low-income rental housing was approximately 5 to 8 percent. The trial court found that, as a practical matter, not all of the 2.9 percent of multifamily parcels located outside the buffer zones around schools and parks was necessarily available for rent to parolees due to the demand for low-cost housing in San Diego County, which had more than doubled in recent years.

Petitioners' counsel also enlisted the assistance of four investigators from the San Diego County Public Defender's Office to identify the potential number of compliant multifamily rental units that might reasonably be located and secured by registered sex offender parolees looking for such housing. Various factors were considered that could make it difficult for such persons to secure compliant housing, including the parolees' limited financial resources that typically made rent exceeding $850 per month[5] prohibitive; whether a criminal background check was required; whether a credit history check was required; whether a deposit of more than two months' rent or income of more than two and one-half times the rent were required; and access to available public transportation. The investigators deemed otherwise compliant housing unsuitable if it met any of these exclusionary criteria. Limiting their search to compliant multifamily parcels with at least five units due to time constraints, the investigators found that only

---

[5] The $850 figure was chosen because it is within the range of $800 to $1,000 that Social Security Disability Income and Supplemental Security Income recipients in San Diego typically receive per month.

11

one-quarter of the 54 apartment complexes containing more than 60 units in the county rented units for $850 or less per month, with none available in downtown San Diego, and that of the 57 apartment complexes with between 15 and 60 units, only nine had units that rented for $850 or less per month.

**D.** *CDCR's statewide protocol for enforcing the residency restrictions*

Upon their release from prison on parole, parolees are informed of their parole conditions and are further notified of the availability of social services, medical and psychological treatment resources, drug and alcohol dependency services, job counseling, and services for obtaining a general equivalency certificate, all designed to assist their transition back into society at no cost to them. Registered sex offenders released on parole are additionally advised of their obligation to comply with the residency restrictions of Jessica's Law. They bear the responsibility for locating compliant housing, as reflected in CDCR's policy memoranda. Parole agents are not authorized to tell sex offender parolees where to live or to recommend areas where they should look for compliant housing. In some specified and limited circumstances, if the parolee cannot afford housing, CDCR will provide funds so that he or she can obtain temporary transitional housing. Such limited housing assistance is usually reserved for the mentally ill, or for those who require housing for their or the public's safety, and is usually limited to 60 days and $1,500.

Upon locating a particular residence where he or she would like to live, a registered sex offender parolee must disclose the address of the intended residence to the parole agent. The agent has six working days to verify whether the parolee's intended residence is compliant with section 3003.5(b)'s residency restrictions, i.e., not within 2,000 feet of a school or park where children regularly gather. The parolee cannot move into the residence before the agent confirms it is compliant. A determination that a proposed residence is noncompliant may be administratively appealed. If the proposed residence is not compliant, the parolee must declare himself or herself "transient," and

12

must register with the parole office and local law enforcement agency as such.[6] It is a parole violation for a transient parolee to be in a noncompliant residence except for up to two hours twice a day to charge his or her Global Positioning System (GPS) device. However, a transient parolee is allowed to be in a noncompliant residence for approved employment, to conduct legitimate business, or to obtain care and treatment from licensed providers.

As noted by the Court of Appeal, among other things, CDCR Policy No. 07-36 requires supervisors of parole agents who handle registered sex offender caseloads to " 'continue to collaborate with community-based programs and local law enforcement to facilitate the identification of compliant housing for sex offender parolees.' " The Court of Appeal also noted the policy also requires supervisors to " 'utilize all available resources to obtain a current listing of all public and private schools and parks within their communities,' " and to provide " '[u]pdated information' " from the list to parole agents at least once a month. CDCR also has a procedure for obtaining waivers of the residency restrictions for parolees who are mentally ill and are housed in a mental health facility, and for parolees who are in need of medical care in a licensed medical facility that provides 24-hour care.

### E. *Enforcement of section 3003.5(b) in San Diego County and the resulting increased homelessness among paroled registered sex offenders*

At the time of the evidentiary hearing there were 482 registered sex offenders on active parole in San Diego County who were not in custody or in parolee-at-large status. Of that group, 165 (34 percent) were registered as transient or homeless, and 317 had a

---

[6] " '[T]ransient' " for this purpose is defined as a registered sex offender parolee "who has no residence." (§ 290.011, subd. (g).) " 'Residence' " is defined as an address "at which a person regularly resides, regardless of the number of days or nights spent there, such as a shelter or structure that can be located by a street address, including, but not limited to, houses, apartment buildings, motels, hotels, homeless shelters, and recreational and other vehicles." (*Ibid.*)

residential address on file with their parole office. However, the latter group included 140 parolees who had sought habeas corpus relief and received a stay of enforcement of section 3003.5(b) pending resolution of the lead cases in this consolidated proceeding. The trial court found that some percentage of those 140 parolees may be living in noncompliant but authorized housing as a result of their stays, and may too have to declare themselves transient and homeless if the stays are lifted.

Detective Jim Ryan, a supervisor in the San Diego Police Department's Sex Offender Registration Unit, testified to a dramatic increase in the number of sex offender parolees who registered as transient with his department in the two years after Jessica's Law took effect on November 7, 2006. Between September 2007 and August 2010, the number of registered sex offenders on active parole in the City of San Diego who registered as transient with the San Diego Police Department increased four- to fivefold. Prior to Jessica's Law, many registered sex offender parolees lived in residential hotels in downtown San Diego, a situation favored by law enforcement because it fostered better surveillance and supervision. Some of these hotels are not in locations compliant with the residency restrictions, while others have been since demolished as result of redevelopment.

Evidence was also presented below attesting that, from a law enforcement perspective, homeless sex offender parolees are more difficult to supervise than those who have established residences. Parole Agent Maria Dominguez testified that before Jessica's Law was enacted, she did not allow sex offender parolees in her caseload to live "on the street." Many lived in residential programs or in downtown San Diego hotels, where they could be easily supervised. When her office began enforcing the residency restrictions of Jessica's Law in 2007, agents would show parolees areas they considered compliant or tell them about specific addresses. But when her supervisor was transferred, agents were no longer allowed to advise parolees about compliant areas. If a parolee asked where he or she could live, the agent was instructed to say: "I can't tell you where

14

you could live, but if you bring me an address I will check it and make sure that it's compliant."

Parole Agent Manuel Guerrero, who for three and one-half years was the supervisor of one of the two San Diego County units that supervise sex offender parolees, testified that as of the time of the hearing CDCR had not issued a policy statement defining either "school" or "park" for purposes of enforcing Jessica's Law. Guerrero defined "school" as any public or private school from kindergarten through 12th grade, but acknowledged some sex offender parolees in San Diego County have received Jessica's Law parole conditions that extended the restrictions to day care centers.[7] He defined "park" as an area "where kids would normally be at," explaining he would look at whether the location contains, among other things, open grassy areas, playground equipment or soccer and baseball fields, and whether the area is designated as a park. Guerrero conceded the definition of park sometimes differs among parole agents depending on how an agent interpreted the word "park." He agreed that homeless sex offender parolees pose more of a risk to public safety than those with known residences.

Evidence was also presented showing that homelessness poses significant challenges to sex offender treatment professionals in their efforts to rehabilitate sex offenders. John Chamberlin was employed by CDCR to provide psychotherapy and counseling to paroled sex offenders at parole outpatient clinics. Chamberlin testified that homelessness among paroled sex offenders is both morally and psychologically destabilizing to the parolees, hindering the success of their therapy and rehabilitation. Similarly, Michael Feer, a clinical social worker previously employed by CDCR to provide group and individual counseling to sex offenders at a parole outpatient clinic,

---

[7] Since the evidentiary hearing was conducted in 2011, CDCR has promulgated new regulations regarding its implementation and enforcement of the residency restrictions, including defining a school for purposes of the statute as a "public or private school, kindergarten through 12th grade." (Cal. Code Regs., tit. 15, § 3571, subd. (c).)

15

testified at least 50 percent of his patients were homeless, and that homelessness was a significant impediment to his patients' mental and physical health and stability.

Finally, the trial court took judicial notice of a CDCR report issued in October 2010 by the Department's own Sex Offender Supervision and GPS Monitoring Task Force (Task Force), a multidisciplinary group comprised of CDCR staff, law enforcement personnel, and other outside participants charged with making recommendations to the CDCR on various sex offender issues. The Task Force studied the increased rate of homelessness among paroled sex offenders following the enactment of section 3003.5(b)'s residency restrictions and reported that between 2007 and 2010, the number of homeless sex offender parolees statewide reflected an alarming increase of "approximately 24 times." (Task Force, Rep., *supra*, at pp. 4, 17.) A specific finding was made that "[h]omeless sex offenders put the public at risk. These offenders are unstable and more difficult to supervise for a myriad of reasons." (*Id*. at p. 17.) The Task Force further concluded that homelessness among sex offender parolees weakens GPS tracking, making it more difficult to monitor such parolees and less effective overall. Ultimately, the report recommended that "residence restrictions as set forth in Penal Code section 3003.5(b) should be repealed in favor of targeted residence restrictions." (*Id*. at p. 4, 17.)

## F.  *The trial court's findings of fact*

At the conclusion of the eight-day evidentiary hearing the trial court issued its statement of decision in which it made, among others, the following findings of fact:

1. Despite certain imprecisions, the map book prepared by San Diego County crime analyst Julie Wartell is the most accurate assessment of housing that is reasonably available to registered sex offender parolees in San Diego County.

2. Registered sex offender parolees are unlikely candidates to rent single family homes; they are most likely to be housed in apartments or low-cost residential hotels.

16

3. By virtue of the residency restrictions alone, registered sex offender parolees are effectively barred from access to approximately 97 percent of the existing rental property that would otherwise be available to them.

4. The remaining 3 percent of multifamily rental housing outside the exclusion areas is not necessarily available to registered sex offender parolees for a variety of reasons, including San Diego County's low vacancy rate, high rents, and the unwillingness of some landlords to rent to such persons.

5. In addition to CDCR's policy prohibiting parole agents from supplying registered sex offender parolees with specific information about the location of compliant housing, parole authorities in San Diego County have taken affirmative steps to prevent parole agents from helping parolees find compliant housing.

6. Rigid application of the residency restrictions results in large groups of registered sex offender parolees having to sleep in alleys and riverbeds, a circumstance that did not exist prior to Jessica's Law.

7. The residency restrictions place burdens on registered sex offender parolees that are disruptive in a way that hinders their treatment, jeopardizes their health and undercuts their ability to find and maintain employment, significantly undermining any effort at rehabilitation.

The trial court concluded the residency restrictions, enforced as a mandatory parole condition against the four petitioners (Taylor, Glynn, Briley, and Todd) in San Diego County, are "unconstitutionally unreasonable," and ordered CDCR to cease enforcing the restrictions against petitioners. The court subsequently issued a supplemental statement of decision ordering CDCR to cease enforcing section 3003.5(b) as a blanket parole condition against any registered sex offender on active parole in San Diego County. At the same time, however, the trial court concluded parole authorities retain the authority to impose special conditions on registered sex offender parolees that

17

mirror the residency restrictions of section 3003.5(b), or are even more restrictive, as long as they are based on the specific circumstances of the individual parolee.

## G. *The appeal*

CDCR appealed the trial court's injunctive orders. The Court of Appeal affirmed, concluding that "the blanket enforcement of section 3003.5(b) as a parole condition in San Diego County has been unreasonable and constitutes arbitrary and oppressive official action." Like the trial court, the Court of Appeal concluded that "[p]arole agents retain *the discretion* to regulate aspects of a parolee's life, such as where and with whom he or she can live. (§§ 3052, 3053, subd. (a).) Agents may, after consideration of a [registered sex offender] parolee's particularized circumstances, impose *a special parole condition* that mirrors section 3303.5(b) or one that is more or less restrictive. It is only the *blanket* enforcement — that is, to all registered sex offender parolees without consideration of the individual case — that the trial court prohibited and we uphold." (First and second italics added.)

We granted CDCR's petition for review.

## DISCUSSION

Petitioners in this consolidated habeas corpus proceeding sought writ relief on grounds that the residency restrictions in section 3003.5(b), as applied to them and similarly situated registered sex offenders on parole in San Diego County, are "unconstitutionally unreasonable." After an eight-day evidentiary hearing, the trial court concluded that the blanket application of the residency restrictions violates their constitutional rights by denying them access to nearly all rental housing in the county that would otherwise be available to them, and as a direct consequence, has caused a great many of them to become homeless, and has further denied them reasonable access to medical and psychological treatment resources, drug and alcohol dependency services, job counseling, and other social services to which parolees are entitled by law.

18

As a general matter, we review the grant of a writ of habeas corpus by applying the substantial evidence test to pure questions of fact and de novo review to questions of law. (*In re Collins* (2001) 86 Cal.App.4th 1176, 1181.) "[W]hen the application of law to fact is predominantly legal, such as when it implicates constitutional rights and the exercise of judgment about the values underlying legal principles, [the appellate] court's review is de novo." (*Ibid*.) The Court of Appeal determined that the trial court's factual findings are supported by substantial evidence adduced at the evidentiary hearing. CDCR does not contest that conclusion. We therefore proceed with our de novo review of the constitutional legal questions in light of the factual record made below.

## A. Standard of review applicable to petitioners' constitutional challenges

We next consider what particular standard of review should be invoked to evaluate the constitutionality of section 3003.5(b)'s mandatory residency restrictions, as applied to petitioners in San Diego County, in light of the constitutional challenges they have raised.

Petitioners alleged below that blanket enforcement of section 3003.5(b)'s mandatory residency restrictions violates their fundamental constitutional rights to intrastate travel, to establish and maintain a home, and to privacy and free association with others within one's home; and further effectively "banishes" them from establishing homes or residing anywhere in the county. The Fourteenth Amendment's due process clause " 'forbids the government to infringe . . . "fundamental" liberty interests' " in any manner " 'unless the infringement is narrowly tailored to serve a compelling state interest [i.e., strict scrutiny review].' " (*Washington v. Glucksberg* (1997) 521 U.S. 702, 721 (*Glucksberg*), quoting *Reno v. Flores* (1993) 507 U.S. 292, 302 (*Reno*).) Petitioners urge that the constitutionality of section 3003.5(b) must be evaluated under heightened strict scrutiny review.

CDCR in turn argues that while some of the constitutional rights petitioners assert—the right to intrastate travel, to establish and maintain a home, and to privacy and

19

free association within one's home—may be considered fundamental rights when advanced by members of the general public, the liberty interests of registered sex offenders while on parole are necessarily lawfully circumscribed and protected to a lesser degree than those of ordinary citizens. CDCR argues that petitioners, while serving a term of supervised parole, do not enjoy the claimed fundamental constitutional rights and liberty interests in their fullest sense, and accordingly, rational basis review, rather than heightened strict scrutiny review, is the appropriate level of judicial scrutiny by which to gauge the constitutionality of section 3003.5(b). Generally speaking, when a facial constitutional challenge is raised, and the "threshold requirement" for strict scrutiny review, i.e., that "a challenged state action implicate a fundamental right," is not established with regard to the person or class of persons raising the constitutional challenge, all that is required is that "a reasonable relation to a legitimate state interest" (*Glucksberg, supra,* 521 U.S. at p. 722) (i.e., a rational basis) be shown in order to justify the state action or find the challenged statute constitutional. (*Reno, supra,* 507 U.S. at p. 306.)

CDCR's threshold premise, that the liberty interests of parolees is not the same as those of ordinary citizens, finds support in the case law. The United States Supreme Court has recognized that parolees enjoy fewer constitutional rights than do ordinary persons. (*Morrissey v. Brewer* (1972) 408 U.S. 471, 482.) This court likewise has observed that "[t]he interest in parole supervision to ensure public safety, which justifies administrative parole revocation proceedings in lieu of criminal trial with the attendant protections accorded defendants by the Bill of Rights, also permits restrictions on parolees' liberty and privacy interests." (*People v. Burgener* (1986) 41 Cal.3d 505, 532 (*Burgener*), overruled on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 756.) "Parole is the conditional release of a prisoner who has already served part of his or her state prison sentence. Once released from confinement, a prisoner on parole is not free from legal restraint, but is constructively a prisoner in the legal custody of state prison

20

authorities until officially discharged from parole." (*Prison Law Office v. Koenig* (1986) 186 Cal.App.3d 560, 566 (*Koenig*), citing *People v. Borja* (1980) 110 Cal.App.3d 378, 382; *Burgener*, *supra*, 41 Cal.3d at p. 531; § 3056 [prisoners on parole remain under the supervision of CDCR].) "Clearly, the liberty of a parolee is 'partial and restricted,' (*People v. Denne* (1956) 141 Cal.App.2d 499, 508; see *People v. Anglin* (1971) 18 Cal.App.3d 92, 95) [and] not the equivalent of that of an average citizen (see *Morrissey v. Brewer*[, *supra*,] 408 U.S. [at p.] 482)." (*Koenig, supra,* at p. 566.) And with specific regard to the housing of parolees, "[c]ourts have traditionally recognized a state's right to require a parolee to live in a particular place. (See *Morrissey v. Brewer, supra*, 408 U.S. at p. 477; *In re Schoengarth* (1967) 66 Cal.2d 295, 300; *In re Faucette* (1967) 253 Cal.App.2d 338, 341 [parolee has no right to choose residence].)" (*Id*. at p. 567.) This court too has explained that the parole authority may impose parole conditions that " '*govern a parolee's residence*, his associates or living companions, *his travel*, his use of intoxicants, and other aspects of his life.' " (*E.J.*, *supra,* 47 Cal.4th at pp. 1282-1283, fn. 10.)

On the other hand, petitioners' assertion that parolees, although under the constructive custody and supervision of the parole authorities, nevertheless retain certain basic rights and liberty interests while on parole, finds support in the case law as well. "[T]he liberty of a parolee . . . includes many of the core values of unqualified liberty" and his or her "condition is very different from that of confinement in a prison." (*Morrissey v. Brewer, supra,* 408 U.S. at p. 482; see also *Burgener, supra,* 41 Cal.3d at p. 530.) As *Burgener*, quoting a commentator, observed, " '[I]n most cases the life of a parolee more nearly resembles that of an ordinary citizen than that of a prisoner. The parolee is not incarcerated; he is not subjected to a prison regimen, to the rigors of prison life and the unavoidable company of sociopaths. . . . The parolee lives among people who are free to come and go when and as they wish. Except for the conditions of parole, he is one of them.' (Note (1969) 22 Stan.L.Rev. 129, 133; see also White, *The Fourth*

21

*Amendment Rights of Parolees and Probationers* (1969) 31 U. Pitt. L.Rev. 167, 177.)"
(*Burgener, supra*, 41 Cal.3d at p. 530.) Moreover, well-settled authority establishes that every parolee retains basic constitutional protection against *arbitrary and oppressive official action*. (*In re Stevens* (2004) 119 Cal.App.4th 1228, 1234; *Terhune v. Superior Court* (1998) 65 Cal.App.4th 864, 874; *Koenig, supra*, 186 Cal.App.3d at pp. 566-567; see also *People v. Reyes, supra*, at pp. 753-754 & cases cited [arbitrary and oppressive parolee searches].)[8]

In this case, however, we need not decide whether rational basis or heightened strict scrutiny review should be invoked in scrutinizing petitioners' constitutional challenges to section 3003.5(b). As we next explain, we are persuaded that blanket enforcement of the mandatory residency restrictions of Jessica's Law, as applied to registered sex offenders on parole in San Diego County, cannot survive even the more deferential rational basis standard of constitutional review. Such enforcement has imposed harsh and severe restrictions and disabilities on the affected parolees' liberty and privacy rights, however limited, while producing conditions that hamper, rather than foster, efforts to monitor, supervise, and rehabilitate these persons. Accordingly, it bears no rational relationship to advancing the state's legitimate goal of protecting children from sexual predators, and has infringed the affected parolees' basic constitutional right to be free of official action that is unreasonable, arbitrary, and oppressive.

---

[8]     The rule that parolees retain constitutional protection against arbitrary and oppressive official action has led to the conclusion that *discretionary* parole conditions must be reasonable. (*In re Stevens, supra,* 119 Cal.App.4th at p. 1234; *Terhune v. Superior Court, supra,* 65 Cal.App.4th at p. 874; see also *People v. Reyes, supra,* 19 Cal.4th at pp. 753-754 & cases cited.) Logic further suggests that, even with regard to a *mandatory* condition imposed by law on a class of parolees, the agencies and officials charged with implementing it cannot apply it to individual cases in a wholly arbitrary, capricious, unjust, and oppressive manner.

**B. Scrutiny of petitioners' as-applied constitutional challenges under the rational basis test**

The habeas corpus claims before us do not present a facial challenge to the statute.**9** Instead, petitioners have pursued habeas corpus relief in the wake of *E.J., supra,* 47 Cal.4th 1258, by challenging the constitutionality of the residency restrictions *as applied* to them and other similarly situated registered sex offenders on supervised parole in San Diego County, based on evidence adduced at an eight-day evidentiary hearing ordered by this court. (*Id.*, at pp. 1281-1284.)

"An as applied challenge [seeking] relief from a specific application of a facially valid statute . . . to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute . . . has been applied . . . *contemplates analysis of the facts of a particular case or cases* to determine the circumstances in which the statute . . . has been applied and to consider whether *in those particular circumstances* the application deprived the individual to whom it was applied of a protected right. (See, e.g., *Broadrick v. Oklahoma* (1973) 413 U.S. 601, 615-616; *County of Nevada v. MacMillen* (1974) 11 Cal.3d 662, 672; *In re Marriage of Siller* (1986) 187 Cal.App.3d 36, 49.)" (*Tobe, supra,* 9 Cal.4th at p. 1084, italics added.)

The United States Supreme Court has emphasized that consideration of as-applied challenges, as opposed to broad facial challenges, "is the preferred course of adjudication since it enables courts to avoid making unnecessarily broad constitutional judgments.

---

**9** "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual. (*Dillon v. Municipal Court* (1971) 4 Cal.3d 860, 865.)" (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*).) In *E.J.*, *supra*, 47 Cal.4th 1258, we rejected two such facial challenges to section 3003.5(b), concluding that the residency restrictions, when enforced as a mandatory condition of a registered sex offender's parole, are not impermissibly retroactive and do not violate the state or federal constitutional prohibitions against ex post facto laws. (*E.J.,* at pp. 1264, 1272, 1280.)

23

(*Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 501-502 (1985); *United States v. Grace* (1983) 461 U.S. 171; *NAACP v. Button*, 371 U.S. 415 (1963).)" (*Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 447.) More recently, in *Gonzales v. Carhart* (2007) 550 U.S. 124, the high court explained that "[i]t is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop. '[I]t would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation.' [Citation.] For this reason, '[a]s-applied challenges are the basic building blocks of constitutional adjudication.' [Citation.]" (*Id.* at p. 168.)

At the conclusion of the evidentiary hearing below, the trial court found that blanket enforcement of section 3003.5(b), on its express terms, effectively barred petitioners access to approximately 97 percent of the multifamily rental housing units in San Diego County that would otherwise be available to them. The court further found the small percentage of remaining compliant housing was not necessarily available to paroled sex offenders due to a variety of factors, including low vacancy rates, high prices, and the unwillingness of some landlords to rent to them. In short, the record establishes that the residency restrictions have prevented paroled sex offenders as a class from residing in large areas of the county, including most of the downtown area in the City of San Diego, as well as almost all of the residential parcels in the Cities of Chula Vista, Vista, El Cajon, Lemon Grove and National City. The exclusionary restrictions may also impact the ability of some petitioners to live and associate with family members. They face disruption of family life because, although the restrictions do not expressly prohibit them from living with family members, if the family members' residence is not in a compliant location, they cannot live there.

The record further reflects that blanket enforcement of the residency restrictions has had other serious implications for all registered sex offenders on parole in San Diego

24

County. Medical treatment, psychological counseling, drug and alcohol dependency services, and other rehabilitative social services available to parolees are generally located in the densely populated areas of the county. Relegated to less populated areas of the County, registered sex offender parolees can be cut off from access to public transportation, medical care, and other social services to which they are entitled, as well as reasonable opportunities for employment. The trial court specifically found that the residency restrictions place burdens on petitioners and similarly situated sex offenders on parole in the county that "are disruptive in a way that hinders their treatment, jeopardizes their health and undercuts their ability to find and maintain employment, significantly undermining any effort at rehabilitation."[10]

Perhaps most disturbing, the record reflects that blanket enforcement of section 3003.5(b) in San Diego County has led to greatly increased homelessness among registered sex offenders on parole in the county. According to CDCR's own uncontradicted parole database reports, of the 482 sex offender parolees on active parole at the time of the hearing, 165 of them (34 percent or a full one-third) were registered as transient, i.e., homeless. Between September 2007 and August 2010, the number of registered sex offenders on active parole in the City of San Diego who registered as transient with the San Diego Police Department increased four- to fivefold. Detective Jim Ryan, a supervisor in the San Diego Police Department's Sex Offender Registration

---

**10**     The deleterious impact of blanket enforcement of the mandatory restrictions against registered sex offenders on parole in San Diego County further appears in direct contravention of the general legislative intent behind the parole laws. Section 3000, subdivision (a)(1), provides, in pertinent part, "The Legislature finds and declares that the period immediately following incarceration is critical to successful reintegration of the offender into society and to positive citizenship. It is in the interest of public safety for the state to provide for the effective supervision of and surveillance of parolees, including the judicious use of revocation actions, and to provide educational, vocational, family, and personal counseling necessary to assist parolees in the transition between imprisonment and discharge."

Unit, testified to a dramatic increase in the number of sex offender parolees who registered as transient with his department in the two years after the law took effect. The trial court specifically found that blanket enforcement of the residency restrictions in the County has "result[ed] in large groups of parolees having to sleep in alleys and riverbeds, a circumstance that did not exist prior to Jessica's Law."

The increased incidence of homelessness has in turn hampered the surveillance and supervision of such parolees, thereby thwarting the legitimate governmental objective behind the registration statute (§ 290) to which the residency restrictions attach; that of protecting the public from sex offenders. (See *Wright v. Superior Court* (1997) 15 Cal.4th 521, 527.) The trial court took judicial notice of the final report issued in October 2010 by the CDCR Task Force, a multidisciplinary group comprised of CDCR staff, law enforcement personnel, and other outside participants charged with making recommendations to the CDCR on various sex offender issues. The Task Force's final report concluded that the Jessica's Law's residency restrictions failed to improve public safety, and instead compromised the effective monitoring and supervision of sex offender parolees, placing the public at greater risk. A specific finding was made that "[h]omeless sex offenders put the public at risk. These offenders are unstable and more difficult to supervise for a myriad of reasons." (Task Force, Rep., *supra*, p. 17.) The report further found that homelessness among sex offender parolees weakens GPS tracking, making it more difficult to monitor such parolees and less effective overall. CDCR has conceded in its briefs before this court that "[t]he evidence . . . demonstrated that the dramatic increase in homelessness has a profound impact on public safety," and that "there is no dispute that the residency restriction[s] [have] significant and serious consequences that were not foreseen when it was enacted."[11]

---

[11]    It has further been suggested that increased homelessness resulting from the enforcement of Jessica's Law's residency restrictions thwarts the purpose and intent behind Megan's Law (Stats. 1996, ch. 908, § 3), which authorizes public disclosure of the

Last, the trial court agreed with petitioners that the manner in which CDCR has been implementing the residency restrictions in San Diego County has subjected them to arbitrary and oppressive official enforcement action, thereby contributing to the law's unintended, unforeseen, and socially deleterious effects. Petitioners point to evidence that both CDCR and local San Diego County parole authorities have refused to assist registered sex offender parolees to find housing that complies with the statutory residency restrictions. CDCR's policy memoranda in effect at the time of the hearing reflect that registered sex offender parolees bear the responsibility for locating compliant housing, and that parole agents are not authorized to tell them where to look for or find compliant housing.

The authorities we have cited above explain that all parolees retain certain basic rights and liberty interests, and enjoy a measure of constitutional protection against the arbitrary, oppressive and unreasonable curtailment of "the core values of unqualified liberty" (*Morrissey v. Brewer, supra,* 408 U.S. at p. 482), even while they remain in the constructive legal custody of state prison authorities until officially discharged from parole. We conclude the evidentiary record below establishes that blanket enforcement of Jessica's Law's mandatory residency restrictions against registered sex offenders on parole in San Diego County impedes those basic, albeit limited, constitutional rights. Furthermore, section 3003.5(b), as applied and enforced in that county, cannot survive rational basis scrutiny because it has hampered efforts to monitor, supervise, and rehabilitate such parolees in the interests of public safety, and as such, bears no rational relationship to advancing the state's legitimate goal of protecting children from sexual predators.

residential addresses and notification of the whereabouts of registered sex offenders in California in the interests of public safety. (See §§ 290.45, 290.46.) It is more difficult to track paroled sex offenders who are transient and have no residential addresses, and to notify the public of their whereabouts.

27

Last, we agree with the observations of the Court of Appeal that CDCR retains the statutory authority, under provisions in the Penal Code separate from those found in section 3003.5(b),[12] to impose special restrictions on registered sex offenders in the form of discretionary parole conditions, including residency restrictions that may be more or less restrictive than those found in section 3003.5(b), as long as they are based on, and supported by, the particularized circumstances of each individual parolee.

---

[12] The Legislature has given CDCR and DAPO expansive authority to establish and enforce rules and regulations governing parole. (§§ 3052, 3053.) Additionally, state law provisions already imposing limitations on the places where registered sex offenders may visit and reside, include prohibitions against: (1) entering while on parole any park where children regularly gather without the express permission of the offender's parole agent if the victim of the registerable offense was under 14 years of age (§ 3053.8); (2) residing with other registered sex offenders in a single family dwelling while on parole (§ 3003.5, subd. (a)); (3) entering any school without lawful business and written permission from a school official (§ 626.81); (4) loitering about any school or public place where children congregate after being asked to leave by a school or law enforcement official (§ 653b, subd. (b)); and (5) entering a day care or residential facility for elders or dependent adults without registering with the facility administrator if the victim of the registerable offense was an elder or dependent adult (§ 653c).

## CONCLUSION

The judgment of the Court of Appeal is affirmed.

**BAXTER, J.***

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**GROVER, J.****

---

* Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

** Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Taylor

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 209 Cal.App.4th 210
**Rehearing Granted**


_____

**Opinion No.** S206143
**Date Filed:** March 2, 2015

_____

**Court:** Superior
**County:** San Diego
**Judge:** Michael D. Wellington


_____

**Counsel:**

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Susan Duncan Lee, Acting State Solicitor General, Donald E. de Nicola, Deputy State Solicitor General, Jennifer A. Neill, Assistant Attorney General, Philip Lindsay, and Gregory J. Marcot, Deputy Attorneys General, for Appellant the People.

Randy Mize, Chief Deputy Public Defender, and Laura Beth Arnold, Deputy Public Defender, for Respondents William Taylor, Jeffrey Glynn, Julie Briley and Stephen Todd.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gregory J. Marcot
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2606

Laura Beth Arnold
Deputy Public Defender
450 B Street, Suite 900
San Diego, CA  92101
(619) 338-4706