Filed 4/29/15  P. v. Crowe CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064862 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN315953) |
| BRYAN CROWE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kathleen M. Lewis, Judge.  Affirmed.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

## I.

## INTRODUCTION

A jury convicted Bryan Crowe of one count of a lewd act upon a 14- or 15-year-old child who was at least 10 years younger than Crowe (Pen. Code, § 288, subd. (c)(1)).[1] The trial court sentenced Crowe to two years in state prison and ordered him to register as a sex offender under section 290. Crowe contends that (1) there was insufficient evidence that he acted with the requisite specific intent to support his conviction of committing a lewd act under section 288, subdivision (c)(1); (2) the trial court prejudicially erred by giving the jury an incorrect version of CALCRIM No. 350 that failed to properly instruct the jury regarding how to evaluate evidence of his good character; (3) mandatory sex offender registration under section 290 for his conviction under section 288, subdivision (c)(1) violates his rights under the equal protection clause of the United States Constitution; and (4) the residency restrictions imposed by section 3003.5 should be stricken from his section 290 registration requirement because they constitute cruel and unusual punishment in violation of the state and federal constitutions. We affirm.

---

[1]    All statutory references are to the Penal Code unless otherwise specified.

2

## II.

## FACTS

### Prosecution evidence

In February 2013, 14-year-old Karina was living with her 25-year-old brother Nate, who was her legal guardian, and his wife Chayna. Crowe lived with his wife and children in the apartment across the hall from Nate's apartment. Karina was friends with Crowe's 14-year-old stepdaughter, Lindsay, and 12-year-old stepson, Tyler.

On Thursday, February 14, 2013, Nate and Chayna went to Las Vegas for the weekend and left Karina alone in their apartment. Nate and Chayna told Crowe and his wife, Dineal, that Karina would be alone in the apartment on Thursday night only. They had planned for Karina's mother to pick up Karina after school on Friday, but Karina told her mother that she had to clean the apartment and take care of other things, and arranged to have her mother pick her up on Saturday. When Dineal found out that Karina was going to be home alone on Friday night, she gave Lindsay and Tyler permission to spend the night with Karina in Nate and Chayna's apartment. Crowe and Dineal told the children that they had to stay inside the apartment, but the children disobeyed.

Around midnight, Crowe ran into Karina in front of her apartment and asked her where his stepchildren were. Karina pointed to an area beyond a fence on the other side of the swimming pool. Crowe told Karina to go back inside her apartment and to stay

3

inside and not open the door. Karina returned to her apartment and fell asleep on the couch. She did not go back outside that night.

At approximately 6:00 a.m., Crowe knocked on Karina's apartment door and Karina let him in the apartment. He told Karina that he was returning a pair of Nate's shoes that Tyler had been wearing the night before. He put the shoes on the floor and then sat on the couch. Karina testified that she sat next to Crowe on the couch because "[i]t only seemed polite." Crowe told Karina that she was in trouble because his wife had called Nate and told him what Karina and the other children had been doing the previous night. However, he added that he had not told Nate anything, and said that if Nate asked, he would tell him that Karina "didn't do those things." Karina told Crowe that she was "ready to face the consequences with [Nate]."

Crowe and Karina continued to talk on the couch and at some point, Crowe put his arm around Karina. Karina initially thought that Crowe was "just being a fatherly figure" and that he was going to give her a hug. However, Crowe started rubbing her right arm "up and down," and then rubbed her right leg in way that caused the loose fitting basketball shorts that she was wearing to slide up her leg. Karina became "confused and scared" because that was "not supposed to happen." Crowe rubbed Karina's arm a second time and then rubbed her right breast. Karina stood up and crossed her arms because she felt "uncomfortable" and "weird." She did not want to do anything sexual with Crowe. She expected Crowe to apologize, but "[h]e acted like it never happened." Crowe stood

4

up and said, "Okay.  Well, I won't tell your brother."  He then left the apartment and Karina locked the door "[s]o he wouldn't come back."

Karina lay back down on the couch for about 10 minutes and became "intensely scared" about just having been "touched by an older man."  She called her mother to see what time she was going to pick her up, but did not mention the incident with Crowe. She then called Nate in Las Vegas and told him what had happened.  Nate told her to call the police, and Karina called 911 immediately after she ended her call to Nate.  She told the 911 dispatcher that Crowe had "tried to touch [her]."  She said,  "[H]e was like touching my arms and while he was talking to me and at first I thought he was just trying to be a father to me, then . . . he touched, like . . . my breast and then . . . I got scared so I got up . . . ."  She told the dispatcher that Crowe had touched her breast over her shirt and had tried to "put [her] . . . shorts up" by rubbing her leg.

A police officer who contacted Karina in her apartment shortly after the 911 call testified that Karina was shaking and "had an almost bewildered look on her face."  After Karina told the officer what had happened, the officer contacted Crowe outside his apartment and arrested him.

A detective interviewed Crowe at the police station at 10:00 a.m.  The detective noticed that his eyes were bloodshot and watery and that his breath had an odor of alcohol.  Crowe told the detective that he had drank 10 to 12 beers and some Fireball cinnamon whiskey the night before.  He initially denied that he had gone to Karina's apartment that morning, but eventually admitted that he had sat on the couch next to

5

Karina. He said that Karina "leaned up against [him]" and started to "snuggle." He admitted that he touched and rubbed her breast, and he demonstrated for the detective the manner in which he had touched her breast by opening and closing his hand in a squeezing motion. The detective asked, "So like for a split second you were thinking okay, this is gonna be somethin' sexual but then you caught yourself?" Crowe answered, "Yeah." The detective asked Crowe if his touching Karina was "like a sexual thing." Crowe responded, "Yeah, at first." Crowe later told the detective that Karina had "leaned back on [him]." The detective asked Crowe whether he thought Karina's leaning on him was "somethin' sexual" or "was just like an affectionate thing." Crowe said he thought it was "like sexual kinda like . . . ." The detective later asked Crowe if he responded the way he had because he thought that Karina was coming on to him sexually. Crowe said, "Yeah."

*Defense evidence*

Dineal testified that she and Crowe had been together for about 10 years and were friends with Nate and Chayna. When Dineal and Crowe gave Lindsay and Tyler permission to stay with Karina the night before the incident, they told them not to leave Karina's apartment under any circumstances and that they would be checking to make sure the children were there. Dineal and Crowe then went out for dinner. While they were out, Crowe drank three 24-ounce beers and some sake. When they returned home, Crowe continued to drink beer and also drank shots of Fireball. Lindsay and Tyler went

6

to Karina's apartment at around 10:00 p.m. Dineal and Crowe played poker with some friends until about 1:30 a.m., when Dineal went to bed.

Sometime after Dineal went to bed, Crowe came into the bedroom and told her that the children were not at Karina's apartment. Crowe and Dineal found the children outside. Dineal told Lindsay and Tyler to go inside their apartment and said she was going to call Nate and Chayna to tell them what was going on. Karina cried and begged Dineal not to tell Nate. Dineal said to Karina, "You're done," and called Nate. She ultimately spoke to Chayna and told her that Karina was running around the apartments at 1:30 a.m. Dineal went back to bed between 2:30 and 3:00 a.m. Crowe stayed up and continued to drink beer.

Dineal testified that during her relationship with Crowe, she had seen him interact with his daughter and other young women and children, and had never seen him engage in any sexually inappropriate conduct toward children. Shayla Owens, a family friend from Washington who had known Crowe for 10 years, since she was 11 years old, testified that she and her younger sister spent most weekends with Crowe and his family, and that her sister used to babysit for Crowe and Dineal. Owens felt comfortable being around Crowe and was comfortable with her sister being around him. She did not believe Crowe was a child molester.

Defense counsel read the testimony of Nate and Chayna from the preliminary hearing into the record. Chayna testified that Karina began living with her and Nate about four months before the incident. After Karina moved in, incidents of her lying to

7

them and other behavioral problems occurred with increasing frequency. She was habitually late to school and had problems with her teachers. Nate and Chayna disciplined her by taking away her allowance and privileges, grounding her, and cutting her hair short. Chayna testified that Karina was manipulative and that she had gotten into arguments with Karina that caused a lot of tension in her and Nate's marriage.

Nate testified that before Karina moved in with him and Chayna, she had lived with her mother and then with Karina's and Nate's biological father. Nate felt that it would be best for Karina to move in with him and Chayna because Karina's mother lacked the means to care for her and their father had been neglectful. Nate and Chayna had escalating problems with Karina and caught her in numerous lies. Nate testified, "[Karina] . . . not only came into our house and, like, kind of messed up mine and my wife's marriage, she also put us through a lot of strain and made me feel bad for her, even though she was basically lying to me the whole time."

When Karina called Nate on the morning of the incident, she sounded scared and was crying on the phone, which frightened Nate. Nate told Karina to write down everything that had happened leading up to when the police arrived after the incident.

III.

DISCUSSION

A. *Sufficiency of the evidence to support the conviction*

Crowe contends that his conviction of committing a lewd act under section 288, subdivision (c)(1) must be reversed because the jury's finding that he acted with the

8

requisite specific intent is not supported by substantial evidence. "To determine whether there is substantial evidence to support a conviction we must view the record in a light most favorable to conviction, resolving all conflicts in the evidence and drawing all reasonable inferences in support of conviction. We may conclude that there is no substantial evidence in support of conviction only if it can be said that on the evidence presented no reasonable fact finder could find the defendant to be guilty on the theory presented." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 528-529, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

A violation of section 288, subdivision (c)(1) is a specific intent crime. Section 288, subdivision (a) provides: "[A]ny person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, *with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child*, is guilty of a felony . . . ." (Italics added.) Section 288, subdivision (c)(1), provides: "Any person who commits an act described in subdivision (a) with the intent described in that subdivision, and the victim is a child of 14 or 15 years, and that person is at least 10 years older than the child, is guilty of a public offense and shall be punished by imprisonment in the state prison for one, two, or three years, or by imprisonment in a county jail for not more than one year."

"[S]ection 288 prohibits *all* forms of sexually motivated contact with an underage child. Indeed, the 'gist' of the offense has always been the defendant's intent to sexually

9

exploit a child, not the nature of the offending act. [Citation.] '[T]he purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done. . . . If [the] intent of the act, *although it may have the outward appearance of innocence*, is to arouse . . . the lust, the passion or the sexual desire of the perpetrator [or the child,] it stands condemned by the statute . . . .' [Citation.]" (*People v. Martinez* (1995) 11 Cal.4th 434, 444.) " '[T]he trier of fact looks to all the circumstances, including the charged act, to determine whether it was performed with the required specific intent.' [Citations.] Other relevant factors can include the defendant's extrajudicial statements . . . , the relationship of the parties [citation], and any coercion, bribery, or deceit used to obtain the victim's cooperation or avoid detection [citation]." (*Id.* at p. 445.)

We conclude that Crowe's conviction is supported by substantial evidence that he touched Karina's arm, leg, and breast with the specific intent of arousing, appealing to, or gratifying his or Karina's lust, passions, or sexual desires. It is undisputed that the incident occurred after Crowe entered Karina's apartment at approximately 6:00 a.m., when he knew she was alone in the apartment. Karina testified at trial that Crowe rubbed her right leg in a way that caused the shorts that she was wearing to slide up her leg, and she told the 911 dispatcher that Crowe tried to "put [her] . . . shorts up." She told the 911 dispatcher that she got up from the couch because she became "scared" when Crowe touched her breast, and she testified that she became "confused and scared" because that was "not supposed to happen." Karina's trial testimony and her statements to the 911

10

dispatcher that Crowe touched her in ways that made her feel uncomfortable and afraid support a reasonable inference that Crowe touched her with sexual intent.

Further, Crowe admitted to the detective who interviewed him on the morning of the incident that he squeezed Karina's breast with the thought that, in the detective's words, "this is gonna be somethin' sexual."  When the detective again asked Crowe if his touching Karina was a "sexual thing," Crowe answered, "Yeah, at first."  Crowe told the detective that Karina leaned on him in a way that was more sexual than affectionate, and that he thought she was coming on to him.  Crowe's admissions to the detective that he touched Karina's breast with the thought that he and Karina both wanted a sexual encounter constitute overwhelming evidence that he touched Karina with the requisite sexual intent for a conviction under section 288, subdivision (c)(1).

B.    *Adequacy of the jury instruction regarding evidence of Crowe's good character*

Crowe contends that trial court committed prejudicial error by instructing the jury with the version of CALCRIM No. 350[2] that the prosecution requested instead of

---

2      CALCRIM No. 350 provides:  "You have heard character testimony that the defendant (is a _____ < *insert character trait relevant to crime[s] committed* > person/ [or] has a good reputation for _____ < *insert character trait relevant to crime[s] committed* > in the community where (he/she) lives or works).  [¶] Evidence of the defendant's character for _____ < *insert character trait relevant to crime[s] committed* > can by itself create a reasonable doubt [whether the defendant committed _____ < *insert name[s] of alleged offense[s] and count[s], e.g. battery, as charged in Count 1* >].  However, evidence of the defendant's good character may be countered by evidence of (his/her) bad character for the same trait.  You must decide the meaning and importance of the character evidence.  [¶] [If the defendant's character for certain traits has not been discussed among those who know (him/her), you may assume that (his/her) character for those traits is good.]  [¶]  You may take that testimony into

11

instructing the jury with the version that he requested.  Crowe argues that the version of CALCRIM No. 350 that the court gave failed to properly instruct the jury regarding how to evaluate evidence of his good character.

Crowe requested the following version of CALCRIM No. 350:  "You have heard testimony that the defendant is not a child molester.  [¶]  Evidence of the defendant's character can by itself raise a reasonable doubt whether the defendant committed a Lewd or Lascivious Act on a Child or and Attempted Lewd and Lascivious Act on a Child.  [¶] You must decide the meaning and importance of the character evidence.  [¶]  Consider the testimony along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

The prosecution requested, and the court gave, the following version of CALCRIM No. 350:  "You have heard character testimony that the defendant does not have the character for sexual deviancy.  [¶]  Evidence of the defendant's character for sexual deviancy can by itself create a reasonable doubt whether the defendant committed a Lewd and Lascivious Act on a child 14 or 15 years old as charged in Count One.[3] However, evidence of the defendant's good character may be countered by evidence of his bad character for the same trait.  You must decide the meaning and importance of the

consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

3       The People submit that "[i]t can be reasonably presumed that the second line of the jury instruction contains a clerical error by omitting the words '*lack of.*'  It should have read:  'Evidence of the defendant's *lack of* character for sexual deviancy can by itself create a reasonable doubt . . . .' "  (First italics added.)

character evidence. [¶] You may take that testimony into consideration along with the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

Crowe's counsel objected to the statement in the prosecution's version of CALCRIM No. 350 that "evidence of the defendant's good character may be countered by evidence of his bad character for the same trait." Crowe's counsel argued that the statement was inappropriate because the prosecution had not presented any evidence of Crowe's bad character at trial. The prosecution argued in response that "the evidence in this case can establish contrary character." Crowe's counsel responded that it was inappropriate to view evidence of the present offense as evidence of bad character because "character evidence by its very nature is things about the person's past . . . ."

On appeal, Crowe contends that the statement in the instruction that his "character for sexual deviancy can by itself create a reasonable doubt" was erroneous and failed to properly instruct the jury as to how to evaluate and apply the good character evidence. Crowe argues that "[t]he result of the instruction as given to the jury was that the good character evidence was no longer sufficient in itself to create a reasonable doubt." Although read in isolation, the portion of the instruction stating that "[e]vidence of the defendant's *character for sexual deviancy* can by itself create a reasonable doubt whether the defendant committed [the charged offense]" (italics added) did not apprise the jury that evidence of Crowe's *lack of* character for sexual deviancy could by itself create a reasonable doubt, that meaning is reasonably clear from the preceding sentence, which

13

states: "You have heard character testimony that the defendant does not have the character for sexual deviancy."

Crowe further argues on appeal, as he did in the trial court, that the phrase "evidence of the defendant's good character may be countered by evidence of his bad character for the same trait" should have been deleted from the instruction because the People did not present any evidence of his bad character (i.e., character for sexual deviancy) other than the evidence of his conduct relating to the charged crime. Crowe maintains that evidence of the charged crime is not evidence of bad character, and that allowing the jury to consider it as such "violated the prohibition against [presenting evidence of bad character] and eviscerated [his] due process right to have the jury decide each element of the charged offense beyond a reasonable doubt."

"A trial court may instruct on a theory only if it is supported by 'substantial evidence.' [Citation.] We review the trial court's assessment de novo." (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 76.) If a jury instruction challenged on appeal is ambiguous, we consider whether it is reasonably likely the jury misunderstood and misapplied the instruction. (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) The correctness of jury instructions is determined from the entire charge of the court [or instructions as a whole] rather than from a particular instruction or parts of an instruction. (*Ibid.*) In assessing the probable effect of the instruction on the jury, the reviewing court must also consider whether the arguments of counsel diminished any possible confusion

14

about the challenged instruction or reinforced the correct view of the law stated in the instruction. (*Ibid.*)

We conclude that there was no evidentiary basis to instruct the jury that "evidence of the defendant's good character may be countered by evidence of his bad character for the same trait." The prosecution did not introduce evidence that Crowe had a character for sexual deviancy other than the evidence relating to the charged offense. Character evidence in the form of evidence of specific acts is either evidence of *past* acts—i.e., acts that predate the charged offense—or, in some cases, *subsequent* acts. (See *People v. Myers* (2007) 148 Cal.App.4th 546, 552-553 [Evidence Code section 1103 regarding character evidence of crime victim to prove conduct "contemplates that character evidence comprises something other than evidence of conduct at the time in question, because character evidence is used to show the person acted 'in conformity with' his or her character."]; *People v. Balcom* (1994) 7 Cal.4th 414, 421 [evidence that defendant committed rape and robbery after the charged offense was admissible to show common design or plan].) The People have not cited, and we have been unable to find, any authority supporting the proposition that evidence relating to a charged offense qualifies as evidence of bad character for the purpose of instructing the jury under CALCRIM 350 that evidence of the defendant's good character may be countered by evidence of his bad character for the same trait. Viewing the evidence of the charged offense as character evidence is inappropriate because the charged act has yet to be proved.

15

Moreover, character evidence in the form of *specific acts* is generally inadmissible to counter character evidence in the form of opinion or reputation.  As Crowe and the People both recognize in their briefs, CALCRIM No. 350 is largely based on Evidence Code section 1102, which provides:  "In a criminal action, evidence of the defendant's character or a trait of his character *in the form of an opinion or evidence of his reputation* is not made inadmissible by Section 1101 if such evidence is:  [¶]  (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character.  [¶] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)."  (Italics added.)

As noted in the Law Revision Commission comments to Evidence Code section 1102, "it is usually held that evidence of *specific acts* by the defendant is inadmissible to prove his guilt *even though the defendant has opened the question by introducing evidence of his good character. . . .*  [¶]  Section 1102 codifies the general rule under existing law which precludes evidence of *specific acts* of the defendant to prove character as circumstantial evidence of his innocence or of his disposition to commit the crime with which he is charged."  (Cal. Law Revision Com. com., 29B, pt. 3B, West's Ann. Evid. Code (2009 ed.) foll. § 1102, p. 312, italics added.)  The California Supreme Court in *People v. Wagner* (1975) 13 Cal.3d 612, 619 stated, "As the Law Revision Commission's comments to section 1102 make clear, evidence of specific acts of the accused are, as a general rule, inadmissible to prove his disposition to commit such acts (see also Evid. Code, § 1101); this general rule is applicable 'even though the defendant has opened the

16

question by introducing evidence of his good character.' " (See *People v. Gin Shue* (1943) 58 Cal.App.2d 625, 634 [in questioning a witness called to testify about the defendant's reputation, neither the prosecution nor defense may inquire into the defendant's general misconduct; questioning is limited to the defendant's reputation and the credibility of the witness]; *People v. Cordray* (1962) 209 Cal.App.2d 425, 439-440 [defendant may not use specific acts to establish his good character].)

In sum, the trial court erred in instructing the jury that "evidence of the defendant's good character may be countered by evidence of his bad character for the same trait," because the prosecution did not present any opinion or reputation evidence to counter Crowe's evidence of his good character. Rather, the prosecution requested that portion of CALCRIM No. 350 based solely on evidence of the charged offense. Evidence relating to the charged offense does not support an instruction that evidence of good character may be countered by evidence of bad character for two reasons: (1) evidence of the charged offense is specific-act evidence, which is generally inadmissible to counter evidence of reputation or opinion evidence as to character; and (2) to the extent that evidence of specific acts is ever admissible as character evidence, it does not include evidence of the charged offense.

Although the trial court erred in giving the jury the version of CALCRIM No. 350 that the prosecution requested, we conclude that the error was harmless. Error in giving an instruction that is a correct statement of law but has no application to the facts of the case is an error of state law subject to the harmless error test set forth in *People v. Watson*

17

(1956) 46 Cal.2d 818, 836 (*Watson*).  (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1130.)  "Under *Watson*, reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred."  (*People v. Guiton, supra,* at p. 1130.)  We conclude that in light of the overwhelming evidence that Crowe is guilty of the charged offense, particularly his admissions to the police that he touched Karina's breast with the thought that he and Karina both wanted a sexual encounter, it is not reasonably probable that he would have obtained a more favorable outcome at trial if the court had not included the statement that "evidence of the defendant's good character may be countered by evidence of his bad character for the same trait" in the version of CALCRIM No. 350 that it gave the jury.

C.      *Constitutionality of mandatory sex offender registration for violation of section 288, subdivision (c)(1)*

Crowe contends that mandatory sex offender registration under section 290 for his conviction under section 288, subdivision (c)(1) violates his rights under the equal protection clause of the United States Constitution because a person convicted of unlawful sexual intercourse with a minor under the age of 16, in violation of section 261.5, subdivision (d),[4] is similarly situated but is not subject to the same registration requirement.  "Where, as here, a disputed statutory disparity implicates no suspect class

_____

[4]      Section 261.5, subdivision (d) provides:  "Any person 21 years of age or older who engages in an act of unlawful sexual intercourse with a minor who is under 16 years of age is guilty of either a misdemeanor or a felony, and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170 for two, three, or four years."

18

or fundamental right, 'equal protection of the law is denied only where there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." ' [Citations.] 'This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in " 'rational speculation' " as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record." ' [Citation.] To mount a successful rational basis challenge, a party must ' "[negate] every conceivable basis" ' that might support the disputed statutory disparity. [Citations.] If a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' [Citation.]" (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*).)

Crowe's equal protection argument rests entirely on *People v. Hofsheier* (2006) 37 Cal.4th 1185 (*Hofsheier*) and Court of Appeal decisions that followed its reasoning. The California Supreme Court in *Hofsheier* decided that imposing mandatory sex offender registration under section 290 on a 22-year-old defendant convicted of nonforcible oral copulation of a 16-year-old girl in violation of section 288a, subdivision (b)(1) violated the defendant's constitutional right to equal protection under the law because a person convicted of unlawful sexual intercourse with a minor in violation of section 261.5 was not subject to mandatory registration. (*Hofsheier, supra,* at pp. 1192-1193.) However, in

19

*Johnson*, the California Supreme Court overruled *Hofsheier* and disapproved the Court of Appeal decisions that followed it. (*Johnson, supra,* 60 Cal.4th at p. 888.)

The *Johnson* court noted that "[a]mong the various sex offenses, unlawful sexual intercourse is unique in its potential to result in pregnancy and parenthood. The act of intercourse, by itself, nearly always carries this potential, while engaging in oral copulation or other nonintercourse sexual activity, by itself, never does. Given the potential life-altering consequences of intercourse, it may seem, at first blush, anomalous that section 261.5 is one of the only—if not *the* only—offenses proscribing sexual contact with a minor that is subject to discretionary, as opposed to mandatory, registration. (§ 290.006.)

"Though section 261.5 violations may seem just as deserving of mandatory registration as nonforcible oral copulation offenses, the legislative history of section 261.5 dispels any notion that confining the availability of discretionary registration to intercourse offenders has no rational basis. The 1970 legislation that separated the offenses of rape and unlawful sexual intercourse with a female under age 18—by moving the latter from the general rape statute (§ 261) to section 261.5—originated with the State Bar of California. [Citation.] In an analysis of that legislation, the State Bar's legislative representative explained: 'When there are consenting near-adults involved, but for some reason the girl's parents or the Social Welfare Department wants to force the boy to support the child, it is unrealistic to have the connotation of "rape" attached to his crime. Many private [employers] do not differentiate between "statutory rape" and "forcible

20

rape," and refuse to hire a "rapist." As a result, the capacity to earn money to support a child is severely handicapped. This bill merely seeks to eliminate this social stigma.' [Citation.] Thus, in separating and renaming the offense of unlawful sexual intercourse, the Legislature sought to eliminate, for section 261.5 offenses, the social stigma associated with the rape label so that offenders could more readily obtain employment and support children conceived as a result of such intercourse. [Citations.] This history confirms that the potential for pregnancy and parenthood has, in fact, influenced legislative decisionmaking regarding unlawful intercourse with minors." (*Johnson, supra,* 60 Cal.4th at p. 884, fn. omitted.)

The *Johnson* court further noted that the high teenage pregnancy rate resulting from illicit sex between teenage or younger girls and adult males, many of whom are repeat offenders who have fathered multiple children by different teenage mothers and accept little or no responsibility for the support of their children, costs the state billions of dollars in welfare and healthcare expenses to assist families headed by teenagers. (*Johnson, supra,* 60 Cal.4th at p. 886.) Consequently, "the Legislature amended section 261.5 to subject adults convicted of sexual intercourse with minors to graduated civil penalties (ranging from $2,000 to $25,000), based on the age difference between the minor victim and the adult offender. (§ 261.5, subd. (e)(1).) Any amounts so recovered must be applied toward recouping the costs in pursuing the penalties, with the remainder deposited in the Underage Pregnancy Prevention Fund. (§ 261.5, subd. (e)(2).) These

civil penalties are not applicable to persons convicted of offenses involving sexual contact other than intercourse with minor victims.

"Hence, the very real problem of teen pregnancy and its costly consequences, as well as legislative concern that stigmatization might interfere with employment opportunities and the support of children conceived as a result of unlawful intercourse, offer more than just plausible bases for treating section 261.5 offenders differently than other types of sex offenders. Providing for discretion in section 261.5 cases allows the trial court to order registration in appropriate situations, while maintaining flexibility in those cases where, for instance, registration might cause economic or other hardship to a child born to the minor victim and the adult offender." (*Johnson, supra,* 60 Cal.4th at pp. 885-886.)

The *Johnson* court also noted that the Legislature had considered and ultimately rejected statutory amendments that would have imposed mandatory registration for section 261.5 offenders at least three times. (*Johnson, supra,* 60 Cal.4th at p. 886.) The *Johnson* court reasoned that "[b]ecause the Legislature has acted purposefully and consistently to preserve discretionary sex offender registration for section 261.5 offenders, we may reasonably infer its public policy concerns would not be served by mandating registration for such offenders in order to cure the constitutional infirmity found by *Hofsheier.* (*Ibid.*)

Finally, the *Johnson* court reasoned that " '[w]hen conducting rational basis review, we must accept any gross generalizations and rough accommodations that the

Legislature seems to have made.' [Citation.] 'A classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends" ' [citations], or 'because it may be "to some extent both underinclusive and overinclusive" ' [citations]. Consequently, any plausible reason for distinguishing between oral copulation and intercourse for purposes of mandatory registration need not exist in every scenario in which the statutes might apply. It is sufficient that the oral copulation activity prohibited by section 288a[, subdivision] (b) lacks the same inherent capacity to cause pregnancy as the sexual intercourse activity prohibited by section 261.5. [¶] At bottom, the Legislature is afforded considerable latitude in defining and setting the consequences of criminal offenses. [Citations.] In light of the legitimate purposes of sex offender registration, and the plausible and actual legislative concerns noted above, it cannot be said that the differentiated treatment of section 261.5 and section 288a offenders 'so lack[s] rationality' that it constitutes 'a constitutionally impermissible denial of equal protection.' [Citation.]" (*Johnson, supra,* 60 Cal.4th at p. 887.)

The reasoning in *Johnson* as to why mandatory registration for a violation of section 288a, subdivision (b)(1), does not violate equal protection applies with equal force to mandatory registration for a violation of section 288, subdivision (c)(1).[5] Accordingly, we reject Crowe's equal protection challenge.

---

5     We also agree with the reasoning of the Court of Appeal in *People v. Cavallaro* (2009) 178 Cal.App.4th 103, 114 (*Cavallaro*), which rejected the same equal protection argument that Crowe makes in this case—i.e., that mandatory registration on a conviction of violating section 288, subdivision (c)(1) violated equal protection because a person

D.      *Constitutionality of the residency restrictions imposed by section 3003.5*

Crowe contends that the residency restrictions imposed by section 3003.5,

subdivision (b) should be stricken from his section 290 registration requirement because

they constitute cruel and unusual punishment in violation of the state and federal

Constitutions.[6]  We reject that contention in light of *People v. Mosley* (2015) 60 Cal.4th

convicted of unlawful, nonforcible sexual intercourse with a minor under the age of 16 in violation of section 261.5, subdivision (d) would not be subject to mandatory registration. (*Cavallaro, supra,* at p. 111.)  The *Cavallaro* court rejected the defendant's equal protection challenge for four reasons:  (1) section 288, subdivision (c)(1) includes a specific intent requirement and section 265.1, subdivision (d) does not; (2) there is a threshold age requirement for an offender under section 288, subdivision (c)(1) (the defendant must be at least 10 years older than the minor victim) that is not present under section 261.5, indicating that the Legislature may have concluded that it was necessary to require mandatory registration for the former offense because of the potential for predatory conduct related to the significant age difference between the adult and the minor; (3) *Hofsheier* is distinguishable because the age difference between a victim under section 288, subdivision (c)(1) (14 or 15) and the victim in *Hofsheier* (16), in addition to the age span between the victim and the defendant under section 288, subdivision (c)(1), reflect a legislative intent to protect sexually naïve 14- and 15-year-olds from predatory older adults; and (4) "a person who engages in sexual intercourse with a 14 or 15 year old and who is also at least 10 years older than the minor may be convicted of a lewd or lascivious act under section 288[, subdivision] (c)(1)." (*Cavallaro, supra,* at pp. 114-115.)  In contrast, if the 22-year-old-defendant in *Hofsheier* had engaged in unlawful, nonforcible sexual intercourse with the 16-year-old victim instead of oral copulation, he would not have been subject to mandatory registration.  (*Id.* at p. 115.)

6      Crowe raises a *facial* challenge to section 3003.5, subdivision (b); he does not contend that the statute's residency restrictions are unconstitutional *as applied*.  In *In re Taylor* (2015) 60 Cal.4th 1019 (*Taylor*), paroled registered sex offenders challenged the residency restrictions of section 3003.5, subdivision (b) *as applied* to them, and the California Supreme Court held that the restrictions are unconstitutional as applied to paroled registered sex offenders in San Diego County.  (*Taylor, supra,* at p. 1023.)  The petitioners in *Taylor* did not challenge the residency restrictions as constituting cruel and unusual punishment in violation of the state and federal Constitutions; rather, they alleged that the residency restrictions violated "their fundamental constitutional rights to

24

1044, in which the California Supreme Court concluded that the residency restrictions under section 3003.5 do not constitute punishment.

The California voters enacted Proposition 83, the Sexual Predator Punishment and Control Act, also known as Jessica's Law, in November 2006. (*In re E.J.* (2010) 47 Cal.4th 1258, 1263.) Proposition 83 added subdivision (b) to section 3003.5, which sets forth restrictions on where certain sex offenders subject to the lifetime registration requirement of section 290 may reside. (*In re E.J., supra,* at p. 1263.) Section 3003.5, subdivision (b) provides: "Notwithstanding any other provision of law, it is unlawful for any person for whom registration is required pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather." Crowe argues that section 3003.5, subdivision (b) is punitive because the Legislature intended it to constitute punishment and its residency restrictions have a punitive effect.

In *Mosley,* the California Supreme Court considered whether the residency restrictions of Jessica's Law increased the penalty for a crime under the reasoning of *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), in which the United States Supreme Court "held that the Sixth Amendment generally requires a *jury* to find 'any fact

intrastate travel, to establish and maintain a home, and to privacy and free association with others within one's home; and further effectively 'banish[]' them from establishing homes or residing anywhere in the county." (*Taylor, supra*, at p. 1036.) Although it is unclear from *Taylor* which specific constitutional provisions the residency restrictions allegedly violated, after noting the petitioners' allegations, the *Taylor* court stated: "The Fourteenth Amendment's due process clause ' "forbids the government to infringe . . . 'fundamental' liberty interests" ' in any manner ' "unless the infringement is narrowly tailored to serve a compelling state interest [i.e., strict scrutiny review]." ' [Citations.]" (*Taylor*, *supra*, at p. 1036.)

that increases the *penalty for a crime* beyond the prescribed statutory maximum.' " (*Mosley, supra,* 60 Cal.4th at p. 1038, quoting *Apprendi, supra,* 530 U.S. at p. 490, italics added by *Mosley*.)  The *Mosley* court decided that if "a *judge* makes the findings underlying his or her discretionary order that a convicted criminal defendant must register as a sex offender, . . . the order [is not] invalid under *Apprendi* insofar as it includes registered sex offender *residency restrictions* imposed by Proposition 83 . . . ."  (*Mosley, supra,* at p. 1048.)

The *Mosley* court rejected the defendant's contention, and the Court of Appeal's conclusion, that the residency restrictions of Jessica's Law are punitive.  The *Mosley* court explained that " the residency restrictions of Jessica's Law are not, on their face, an added 'penalty' for [the defendant's] conviction to which *Apprendi* applies.  Like sex offender registration requirements, the restrictions are not intended as punishment or retribution for the offense or offenses that led to their imposition.  Rather, their purpose is to serve a legitimate regulatory goal—reducing the opportunity for persons convicted of sexually related crimes, who are at large in the community but still deemed dangerous, to reoffend in the future.  The restrictions may lead to significant disabilities in individual cases, but in the abstract, they do not so resemble traditional forms of punishment, and are not so clearly punitive in effect, as to override their regulatory aim."  (*Mosley, supra,* 60 Cal.4th at p. 1062.)

The *Mosley* court's analysis was guided by factors identified in *Smith v. Doe* (2003) 538 U.S. 84 (*Smith*) "as relevant to determining whether attempts to control

26

dangerous sex criminals constitute punishment." (*Mosley, supra,* 60 Cal.4th at p. 1063.) The court began "with the settled principle that in the interest of protecting public safety, 'an imposition of restrictive measures on sex offenders adjudged to be dangerous is "a legitimate nonpunitive governmental objective and has been historically so regarded." [Citation.]' [Citation.] At the outset, therefore, the inquiry is whether the state legislative authority, in adopting a law allowing a court to impose such restrictions, intended them as punishment, or instead meant to adopt a nonpunitive regulatory scheme." (*Ibid.*, citing *Smith, supra,* at pp. 92, 93.)

If the intent was to enact a civil, nonpunitive regulatory scheme, the court " 'must further examine whether the . . . scheme is " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " [Citation.] Because [courts] "ordinarily defer to the legislature's stated intent" [citation], " 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.' " (*Mosley, supra,* 60 Cal.4th at p. 1063, citing *Smith, supra,* 538 U.S. at p. 92.) The factors that are most relevant to the analysis of the effects of the regulatory scheme " 'are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.' [Citation.] [The court analyzes] these factors 'in relation to the statute on its face. ' " (*Ibid.*)

27

Based largely on the findings set forth in Proposition 83 and the ballot arguments in support of the proposition, the *Mosley* court concluded that "the electorate had a regulatory, nonpunitive purpose." (*Mosley, supra,* 60 Cal.4th at p. 1065.) The court therefore considered "whether the restrictions, if generally applicable to nonparolee registered sex offenders in California, nonetheless have such a necessary punitive effect as to override this nonpunitive intent," and concluded that they do not. (*Ibid.*)

Crowe argues, as the Court of Appeal in *Mosley* concluded, that the residency restrictions of section 3003.5 are akin to the traditional punishment of banishment and have other punitive effects, such as forcing offenders to move away from established residences if a school or park opens nearby. (*Mosley, supra,* 60 Cal.4th at p. 1065.) The *Mosley* court reasoned: "There is no doubt that the residency restrictions of Jessica's Law can produce significant difficulties and inconveniences in particular areas and individual cases. . . . But we are not persuaded that they so resemble traditional punishment, or are necessarily so harsh, as to compel a conclusion that their punitive effect overrides their regulatory intent.

"Though potentially burdensome, the terms of the residency restrictions are limited. '[They] impose[] no physical restraint, and so [do] not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint. [Citation.]' [Citation.] They infringe upon personal liberties far less than does the 'post-incarceration confinement' of dangerously disordered sex offenders, which the high court has recognized as ' "a legitimate nonpunitive government objective." ' [Citations.] They do

28

not regulate a registered sex offender's daily activities, and they seem, on their face, no harsher 'than the sanction[] of occupational debarment, which [the high court has also] held to be nonpunitive. [Citations.]' [Citation.]

"Nor are the restrictions akin to banishment. One subject to them is not thereby excluded from the state or any part thereof. They do not dictate where he or she may travel, visit, shop, eat, work, or play. Even the law's domiciliary prohibitions are, by their terms, confined to specified geographic areas relevant to the regulatory purpose they serve. Hence, they do not, on their face, meet or approach the traditional definition of banishment—the entire dismissal, expulsion, or casting out from one's community, and into exile. [Citations.] . . .

"Further, the restrictions do not take on the character of punishment by comparison to forms of conditional, supervised postconviction release, such as probation and parole, which might be considered punitive. [Citations.] As applied to nonparolees such as defendant, the residency restrictions involve no oversight or supervision by penal authorities. Their violation cannot result in revocation of a conditional release; rather, the only arguable sanction is 'a [criminal] proceeding separate from the individual's original offense.' [Citation.] The possibility of criminal prosecution for violation of the restrictions is simply calculated to give effect to a 'valid regulatory' measure, and does not make them punitive. [Citation.]

"Similarly, there is little relevance to the fact that the restrictions, like criminal punishment, are aimed at deterring future crimes, and might have that effect. 'Any

29

number of governmental programs might deter crime without imposing punishment. "To hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' . . . would severely undermine the Government's ability to engage in effective regulation." [Citations.]' [Citation.] Indeed, the primary deterrence of the residency restrictions is not a threat that wrongdoing will be met with sanctions—the premise of punishment. Rather, it is simply a way to reduce registered sex offenders' contact with children on whom they might prey by ensuring that such persons will not live near where children routinely gather.

"Finally, the real-life consequences of the residency restrictions of Jessica's Law may vary widely from person to person, and from case to case. Unlike registration requirements, which demand periodic affirmative acts from all registrants throughout their lifetimes [citation], the residency restrictions impose no additional obligations on registrants whose domiciles of choice are, and remain, in compliance with Jessica's Law. In sum, these restrictions do not necessarily inflict such onerous disabilities and restraints, or otherwise so resemble common or traditional forms of punishment, that they must be so labeled . . . despite their regulatory and nonpunitive intent." (*Mosley, supra,* 60 Cal.4th at pp. 1065-1067, fns. omitted.)

In light of *Mosley's* reasoning and conclusion that the residency restrictions of section 3003.5 do not constitute punishment, we conclude that the restrictions do not violate the federal and state constitutional prohibitions against cruel and unusual punishment.

30

DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

McDONALD, J.