Filed 2/10/22  P. v. Garnica CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOAN GARNICA et al.,<br><br>        Defendants and Appellants. | B307386<br><br>(Los Angeles County Super. Ct. No. BA452909)<br><br> ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN THE JUDGEMENT |

THE COURT:

It is ordered that the opinion filed herein on February 3, 2022, be
        modified as follows:

1.  In the fourth full sentence on page 6: before the first parenthesis, insert "or great bodily injury"; after "and," insert ", for the other defendants,"; and after "death," insert "or great bodily injury."  The sentence should read:

> The indictment also alleged that Salas personally discharged a firearm resulting in death or great bodily injury (§ 12022.53, subd. (d)), and, for the other defendants, that a principal in a gang-related offense personally discharged a firearm resulting in death or great bodily injury (§ 12022.53, subds. (d) & (e)(1)).

2.  Before the first full sentence on page 7, which begins "The indictment alleged that," add the following sentence:

> The indictment also alleged that, as to the kidnapping and torture offenses, a principal used a firearm in the commission of a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang" (§ 12022.53, subds. (b), (e)(1)).

3.  In the first full sentence on page 7 (not counting the sentence to be added above), insert ", except for the charge of being a felon in possession of a firearm," between "crimes" and "were," so that the sentence reads:

> The indictment alleged that all of the above-enumerated crimes, except for the charge of being a felon in possession of a firearm, were committed "for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)(1)(C).)

4. On page 7, in the last sentence before part II.B. of the opinion, add "s" to "circumstance" to make it plural, and add
", and that the murders were for criminal street gang purposes (§ 190.2, subd. (a)(22))" to the end of the sentence. The sentence should read:

> The indictment further alleged the special circumstances that Salas had committed multiple murders (§ 190.2, subd. (a)(3)), and that the murders were for criminal street gang purposes (§ 190.2, subd. (a)(22)).

5. On page 8, in the first sentence of part II.D. of the opinion, replace "15" with "25," and replace "187" with "177," so that the sentence reads:

> The trial court sentenced Salas to prison for a determinate term of 25 years, plus two indeterminate terms of life without the possibility of parole, plus 177 years to life, and

3

sentenced Garnica to prison for 125 years to life.

6. On page 26, in the first sentence of part VI.A.1. of the opinion, replace "15" with "25," and replace "187" with "177," so that the sentence reads:

> As to Salas, the trial court imposed a determinate prison sentence of 25 years, followed by two sentences of life without the possibility of parole (LWOP), followed by 177 years to life.

7. In the sentence beginning on page 26 and continuing onto page 27, and comprising the first bullet point of part VI.A.1.: replace "use" with "personal discharge"; replace "by a principal in a felony 'committed for the benefit of, at the direction of, or in association with a criminal street gang,'" with "causing death"; and replace "(§§ 12022.53, subds. (d), (e)(1), § 186.22, subd. (b))" with "(§ 12022.53, subd. (d))." That sentence should read:

> For the murder during the Saticoy Street shooting, the trial court imposed a sentence of LWOP plus 25 years, with the LWOP sentence based on the special circumstance that Salas "intentionally killed [the victim] while [Salas] was an active participant in a criminal street gang and the murder was carried out to further

4

the activities of the criminal street gang" (§ 190.2, subd. (a)(22)), and with the 25-year enhancement based on the personal discharge of a firearm causing death (§§ 12022.53, subd. (d)).

8. On page 27, in the sentence comprising the second bullet point of part VI.A.1.: replace "use" with "personal discharge"; replace "by a principal in a felony 'committed for the benefit of, at the direction of, or in association with a criminal street gang'" with "causing great bodily injury"; and replace "(§§ 12022.53, subds. (d), (e)(1), 186.22, subd. (b))" with "(§ 12022.53, subd. (d))." That sentence should read:

> For each of the three attempted murders during the Saticoy Street shooting, the trial court imposed a base sentence of 15 years to life plus a 25-year enhancement based on the personal discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)).

9. On page 28, at the end of the sentence that begins, "For the kidnapping," replace the "(d)" (referring to a subdivision of section 12022.53) with "(b)," so that the citation ending the sentence reads:

> (§§ 12022.53, subds. (b), (e)(1), 186.22, subd. (b)).

5

10. On page 28, in the sentence beginning "For the torture": insert "the commission of" before "a felony"; and replace "(d)" (referring to a subdivision of section 12022.53) with "(b)," so that the sentence reads:

> For the torture of Covarrubias during the forced tattooing, the court imposed a life sentence plus 10 years, with the 10 years based on the use of a firearm by a principal in the commission of a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang" (§§ 12022.53, subds. (b), (e)(1), 186.22, subd. (b)).

11. On page 30, in the first sentence of the first full paragraph, insert "special circumstance finding and the gang and firearm" between "the" and "enhancements," so that the sentence reads:

> Because the People did not ask the jury to find at least some of the elements that Assembly Bill No. 333 requires (and that the prior law did not require), the special circumstance finding and the gang and firearm enhancements affected by that new law must now be vacated. (Accord, *People v. Sengpadychith* (2001) 26 Cal.4th 316, 325-326.)

12. On page 30: delete "Here is a list of the enhancements that must now be vacated:"; delete the

6

two bulleted paragraphs that follow; and delete footnote 7.

\* \* \*

There is no change in the judgment.

Appellant Salas's petition for rehearing is denied.

_____

LUI, P.J.            ASHMANN-GERST, J.            HOFFSTADT, J.

7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B307386 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA452909) |
| v. | |
| JOAN GARNICA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Los Angeles Superior Court, Lisa B. Lench, Judge.  Affirmed, but sentences vacated in part and remanded for further proceedings.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant Joan Garnica.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant Rene Salas.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Joan Garnica (Garnica) and Rene Salas (Salas) (collectively, defendants) appeal their convictions for murder, attempted murder and other crimes arising out of several incidents of gang-related violence.  Specifically, they argue that the trial court erred (1) in admitting certain evidence against Garnica, (2) in denying their motions to sever the joint trial of the charged incidents into several different trials, one for each defendant as to each incident, (3) in not granting a mistrial after the prosecutor elicited an in-court identification he knew to be false, and, potentially, (4) in its review of discovery sought by the defense.  We conclude there was no individual or cumulative error, and affirm defendants' convictions.  After this matter was initially set for argument, the parties provided supplemental briefing on whether the gang enhancements and other sentencing enhancements premised on gang activity must be vacated in light of the recently enacted Assembly Bill No. 333 (Stats. 2021, ch. 699, § 3).  We conclude that they must, and vacate all of the sentencing enhancements imposed under Penal Code section 186.22, section 12022.53, subdivision (e)(1), or section 190.2, subdivision (a)(22); all other enhancements remain intact.  We remand the matter back to the trial court to give the People the

2

opportunity to decide whether to retry those enhancements. Upon resentencing, the trial court may consider which sentences to stay under the broader discretion granted under section 654 due to recently enacted Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1).

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The Valerio Street Gang*

Valerio Street is a street gang that operates in the San Fernando Valley. Both Salas and Garnica are members of the gang; Salas's moniker is "Lucky," Garnica's is "Little Joe" or "Fat Joe."

#### B. *Incidents in 2015 and 2016*

##### 1. *The Saticoy Street shootings*

On December 22, 2015, Salas, Garnica and others drove in a caravan to Saticoy Street in Van Nuys. Salas was transported in a car driven by his then-girlfriend, Lorena Gonzalez (Lorena).[1] Garnica was transported in a Camaro driven by another Valerio Street gang member.

Salas and three other gang members got out of the car. After the Camaro drove up Saticoy Street, Salas and the others followed on foot. When Salas and the others encountered pedestrians, they asked, "Where you from?" Juan Santos (Santos), one of the pedestrians, walked up to the group. When he did, someone in Salas's group said, "Fuck you" and "Valerio," and multiple group members opened fire on Santos and others in the street. As they fired, they shouted, "Woo hoo!" When they

---

[1]     Because the facts involve several unrelated individuals with the last name "Gonzalez," we will use first names for clarity. We intend no disrespect.

3

ceased firing, they ran back to the caravan of cars, cheering. Santos died from the 13 bullets in his body; the other shooting victims survived.

A surveillance camera captured four men walking up Saticoy Street moments before the shooting began. Garnica's cell phone pinged off the tower nearest the shooting. Within hours of the shootings, Salas used his cell phone to search on Google for news relating to a "shooting in Van Nuys." Salas later told Luz Ramirez (Ramirez), another of his girlfriends, that he and his friends "shot . . . a guy" on December 22, 2015. And when Lorena revealed that she "heard what happened" as she waited around the corner during the shooting, Salas struck her and told her that he could get at her "in or outside."

2. *The Vega shooting*

Just over four months later, on April 29, 2016, Ramirez drove Salas and Garnica to the home where Alexander Vega (Vega) lived. Vega was a member of the Pacoima Crazy Boys street gang, a rival of the Valerio Street gang. In the weeks leading up to April 29, Salas and Vega exchanged text messages in which they used their gang monikers and referred to their gangs' territories; in one message, Salas warned, "This is Lucky [from] Valerio Street. I'll get at you, homey." Vega was also using a printer belonging to Yessenia Ventura (Ventura), who was a Valerio Street gang associate, to print up fake checks. Both men had also dated Ramirez, but Salas on the ride over told Ramirez, "Whatever I do, bitch, don't think it's because of you."

Salas and Garnica arrived at Vega's house just before midnight. Both men got out of the car, pulled up the hoodies they had donned, and approached the closed garage where Vega usually hung out. Salas was armed. With Garnica at his side,

4

Salas entered the garage and, seeing Vega and one other person, shot Vega four times. Vega died from his wounds.

The next day, Salas ran Google searches for news about the shooting. He also told Ramirez that he had shot Vega.

### 3. *The forced tattooing of Covarrubias*

Four days later, on April 30, 2016, Garnica and two others met up with Marcela Covarrubias (Covarrubias). They drove her to a house where Salas and others were hanging out. Covarrubias was a member of the Barrio Van Nuys street gang, a rival of the Valerio Street gang. When she began to boast about her gang, Garnica smashed a glass bottle on her head and she collapsed. When she regained consciousness, she was lying in a reclining position with Salas atop her. He put a gun in her mouth and ordered her to "suck it" while another gang member tattooed Valerio Street-related symbols on her neck and arms. Someone else at the gathering recorded the incident on a cell phone.

### 4. *The prostitution sting*

Four days later, on May 4, 2016, Salas, Garnica and Ramirez were hanging out at a Motel 6 in Sylmar. While there, Garnica started talking to several women who indicated that they were prostitutes but who were, in actuality, undercover police officers. Garnica bragged that he was a member of the Valerio Street gang; told them, "I'm a be strapped the fuck up" (that is, that he was armed); attempted to coerce them into working for him by indicating, "you guys are working for me, right?"; and then offered to serve as their enforcer if a "john" refused to pay or if they decided instead to "set[] . . . up" and rob a "john." After Garnica and Salas began to suspect that women were undercover police, they gave the gun they were carrying to

5

Ramirez so the police would not seize the gun and possibly match it as a weapon used in the prior incidents.

## II.    Procedural Background

### A.    *Charges*

In May 2017, a grand jury returned a 20-count indictment against Salas, Garnica and several others.  As pertinent here, the grand jury returned charges with respect to the (1) Saticoy Street shooting, (2) the shooting of Vega, and (3) the forced tattooing of Covarrubias.  With respect to the Saticoy Street shooting, the grand jury charged Salas and Garnica with the murder of Santos (Pen. Code, § 187)[2] and three counts of attempted premeditated murder (§§ 187, 664, subd. (a)).  The indictment also alleged that Salas personally discharged a firearm resulting in death (§ 12022.53, subd. (d)), and that a principal in a gang-related offense personally discharged a firearm resulting in death (§ 12022.53, subds. (d) & (e)(1)).  For the same set of crimes, the grand jury charged Salas with (1) witness intimidation for his postshooting threat to Lorena (§ 136.1), and (2) being a felon in possession (§ 29800, subd. (a)(1)).  With respect to the shooting of Vega, the grand jury charged Salas (and Ventura) with (1) conspiracy to murder (§ 182) and (2) the murder of Vega (§ 187).[3] The indictment alleged that Salas had personally discharged a firearm causing death (§ 12022.53, subd. (d)).  With respect to the forced tattooing of Covarrubias, the grand jury charged Salas and Garnica with (1) torture (§ 206), (2) aggravated mayhem (§ 205),

---

[2]    All further statutory references are to the Penal Code unless otherwise indicated.

[3]    The People sought to indict Garnica on these same counts, but the grand jury declined to do so.

6

and (3) kidnapping (§ 207). The indictment alleged that all of the above-enumerated crimes were committed "for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)(1)(C).) The indictment further alleged the special circumstance that Salas had committed multiple murders (§ 190.2, subd. (a)(3)).

### B. *Severance motions*

The trial court set a joint trial for Salas and Garnica. Garnica moved to be tried separately from Salas, and Salas moved to sever each of the incidents—the Saticoy Street shootings, the shooting of Vega, and the forced tattooing of Covarrubias—into a separate trial. The trial court denied both severance requests.

### C. *Trial*

The matter proceeded to a joint jury trial that lasted nine days in January and February 2020.

Overruling Garnica's motion in limine, the court ruled that the shooting of Vega was admissible against him under Evidence Code section 1101, subdivision (b), but only to prove (1) "the intent necessary for the gang allegation[s] in this case"; (2) Garnica's motive to commit the Saticoy shootings and the forced tattooing of Covarrubias; and (3) Garnica's intent to kill for the Saticoy shootings. The court also ruled that the prostitution sting was admissible to prove why Salas gave the gun he had used in the prior incidents to Ramirez to hide; however, the court excluded mention of the arrests and charges arising out of the sting.

The trial court instructed the jury that Garnica and Salas could be convicted of these crimes as the actual perpetrator or as direct aiders and abettors. The court did not instruct the jury on

7

the natural and probable consequences theory of aiding and abetting or on any felony-murder theory.

The jury found Salas guilty of all charged crimes, all alleged enhancements, and the special circumstance. The jury found Garnica guilty of the crimes relating to the Saticoy Street shootings, but acquitted him of the crimes relating to the forced tattooing of Covarrubias (as well as any lesser-included offenses).

### D.  *Sentencing and appeal*

The trial court sentenced Salas to prison for a determinate term of 15 years, plus two indeterminate terms of life without the possibility of parole, plus 187 years to life, and sentenced Garnica to prison for 125 years to life.

Both defendants filed timely notices of appeal.

### DISCUSSION

## I.  Evidentiary Issues

Garnica argues that the trial court erred in ruling that the jury could consider the Vega shooting and the prostitution sting against him. We review these evidentiary rulings for an abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 590.)

### A.  *The Vega shooting*

The trial court admitted the Vega shooting under Evidence Code section 1101, subdivision (b). That provision authorizes the admission of uncharged acts to "prove some fact," including "motive" and "intent." (Evid. Code, § 1101, subd. (b).) To be admissible as so-called "1101(b) evidence," a court must find that (1) the purpose for which the uncharged act is offered is relevant to the pending case (*People v. Daniels* (1991) 52 Cal.3d 815, 857-858), (2) the uncharged act has the requisite degree of similarity, which ensures that it has a tendency to prove the purpose for which it is offered (*People v. Lindberg* (2008) 45 Cal.4th 1, 22

8

(*Lindberg*); *People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403
(*Ewoldt*), superseded on other grounds by Evid. Code, § 1108),
and (3) the probative value of the evidence is not substantially
outweighed by the "substantial danger of undue prejudice, of
confusing the issues, or of misleading the jury" (Evid. Code, §
352; *Lindberg*, at pp. 22-23).  To prove intent, the "least degree of
similarity []between the uncharged act and the charged offense[]
is required" (*Ewoldt*, at p. 402)—namely, the proponent need only
prove that there are "'sufficient similarities [between the act and
the crime] to demonstrate that in each instance the perpetrator
acted with the same intent . . . .'" (*People v. Daveggio and
Michaud* (2018) 4 Cal.5th 790, 827, quoting *People v. McCurdy*
(2014) 59 Cal.4th 1063, 1097.)  No similarity between an
uncharged act and a charged offense is required before the act is
admissible to prove motive; instead, there need only be a "nexus"
concerning motive.  (*People v. Thompson* (2016) 1 Cal.5th 1043,
1115.)

Under these standards and as pertinent to this appeal,[4] the
trial court did not abuse its discretion in admitting the Vega
shooting to prove (1) Garnica's intent to kill underlying the
Saticoy Street shootings, (2) Garnica's intent to "to assist,
further, or promote criminal conduct by gang members"
underlying the gang enhancement alleged as to the Saticoy Street
shootings, and (3) Garnica's motive for committing the Saticoy
Street shootings.  Here, Garnica's intent and motive are certainly
relevant:  Not only did Garnica plead not guilty to the crimes and
thereby put every element at issue, but his defense at trial—

4      We need not discuss the admission of this evidence vis-à-vis
the forced tattooing of Covarrubias in light of Garnica's acquittal
of those charges.

9

which he maintains on appeal—is that he was "merely present" at the Saticoy Street shootings. This places his intent and motive squarely at issue. The Vega shooting also had sufficient similarity to the Saticoy shootings that it tends to prove his intent to kill and to further and promote the conduct of his fellow gang member Salas, as well as his motive for committing the Saticoy shootings. The Vega shooting was motivated in part by Salas's gang-related animosity toward Vega; further, Salas formulated a plan to shoot Vega in his garage near midnight, Garnica accompanied Salas to the garage so Salas would not be alone when he accosted Vega without definitive knowledge of who else was in the garage with him. Garnica's act of accompanying Salas while Salas committed a gang-motivated killing is evidence that he directly aided and abetted Salas in that killing, and thus tends to prove that Garnica had a similar intent to kill the victims of the Saticoy Street shootings, had the intent to assist Salas and his fellow gang members on Saticoy Street when he drove by in the Camaro as a distraction, and had the same motive to kill his rival gangs' members. (Cf. *People v. Bigelow* (1984) 37 Cal.3d 731, 748 [evidence that defendant had previously robbed someone else insufficient evidence of motive to qualify for admission under section 1101].) Lastly, the probative value of this evidence of motive and intent is not substantially outweighed by the considerations listed in Evidence Code section 352: Any danger of undue prejudice, confusing the issues or misleading the jury (from the jury's improper consideration of this evidence as "propensity" evidence) was blunted by the court's instruction limiting the purposes for which the Vega shooting was to be considered; further, the need to prove the same offense as

10

charged against Salas means that there was no undue consumption of time.

Garnica responds with three arguments.

First, he argues that the trial court erred in admitting the Vega shooting against him because it came *after* the Saticoy shooting. However, the timing of the uncharged act is not a basis for excluding section 1101(b) evidence. (*People v. Leon* (2015) 61 Cal.4th 569, 597-598.)

Second, he argues that the Vega incident is not sufficiently similar because (1) the Vega incident was *really* an "interpersonal, specific dispute" between Salas and Vega over their romantic interest in Ramirez and over a printer, and (2) the Vega incident is not sufficiently similar because there is insufficient evidence to prove that Garnica was actually involved in either crime. We reject both arguments. As explained above, the Vega incident was also motivated by the gang rivalry between Salas and Vega. And there *is* sufficient similarity: Garnica contends that the sole evidence is that he was *merely present* at both locales, but Garnica was more than present during both incidents (he drove in the Camaro as a diversion and accompanied Salas to Vega's garage for backup) and presence *can* be the basis for aiding and abetting where such presence serves a function that encourages the perpetrator and is done with the requisite specific intent (here, the intent to kill). (E.g., *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 744; *People v. Stankewitz* (1990) 51 Cal.3d 72, 90-91.)

Third, he argues that the probative value of the Vega incident is substantially outweighed by the danger that the jury will consider the Vega incident solely as evidence of his bad character. This argument is premised on his earlier argument

11

that he was not involved in either set of crimes; our rejection of the latter means we reject the former.

Because we find there is no evidentiary error, there is no violation of due process. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)

**B.** *The prostitution sting*

The trial court admitted evidence of the prosecution sting as conduct that was part and parcel of the charged crimes—namely, the disposal of the gun Salas had been using in the prior months. (Accord, *United States v. Dorsey* (9th Cir. 2012) 677 F.3d 944, 951 [when evidence is "inextricably intertwined" with evidence of charged crime such that it "constitute[s] a part of the transaction that serves as the basis for the criminal charge," it need not satisfy the standards for admission of "other act" evidence].) Indeed, Garnica does not dispute this logic when he concedes that the prostitution sting is admissible as a means of explaining Garnica's gang affiliation and why Salas was disposing of the firearm. However, Garnica urges that the trial court went too far in also admitting the facts that (1) he was pandering (that is, recruiting prostitutes), (2) he was bragging about having a gun, and (3) he was willing to enforce payment and/or rob the faux prostitutes' clientele.

The trial court did not abuse its discretion in admitting these additional facts. These facts were inextricably intertwined with the charged crimes insofar as they were necessary to explain *why* Salas and Garnica felt it necessary to get rid of the gun: They feared arrest once they started to suspect the "prostitutes" were undercover cops because Salas and Garnica had been engaged in the illegal conduct of pandering and expressing a willingness to assault or extort their clientele. (Because there is

12

nothing to suggest that Garnica was referring to a different firearm when he bragged about "being strapped," this additional fact is necessary to explain that he and/or Salas possessed the gun they later sought to hide.) And even if we consider these additional facts as section 1101(b) evidence, the trial court did not abuse its discretion in admitting it because it is relevant to show a consciousness of guilt regarding use of the gun (and hence why they needed to get rid of it) (accord, *People v. Farnam* (2002) 28 Cal.4th 107, 163 [consciousness of guilt evidence may be admitted as section 1101(b) evidence]), and this probative value was not substantially outweighed by the danger of unfair prejudice given how minor Garnica's boasting was as compared with the murder, attempted murder, torture, mayhem and kidnapping crimes for which Garnica was standing trial.

## II. Severance Issues

Salas and Garnica also argue that the trial court's severance rulings were wrong. Garnica asked that his trial be severed from Salas's, to prevent the jury from hearing about the Vega shooting with which he was not charged. Salas asked that he have three trials, one for each of the incidents (the Saticoy shootings, the Vega murder, and the forced tattooing of Covarrubias).

### A. *Severance of Garnica's Trial from Salas's*

"When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." (§ 1098.) "'Our Legislature has thus "expressed a preference for joint trials." [Citation.] But the [trial] court may, in its discretion, order separate trials "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion

13

resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony."'" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150.) "We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion." (*People v. Avila* (2006) 38 Cal.4th 491, 575.) "If the court's joinder ruling was proper at the time, a reviewing court may reverse a judgment only on a showing that joinder '"resulted in "gross unfairness" amounting to a denial of due process."'" (*Ibid.*) We review the constitutional question de novo. (*In re Taylor* (2015) 60 Cal.4th 1019, 1035.)

The trial court did not err in declining to sever Garnica's trial from Salas's trial. As to the Saticoy Street shootings and the forced tattooing of Covarrubias, defendants were mutually charged with the same crimes arising from the same events, which our Supreme Court has characterized as a "'classic case'" for a joint trial. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40.) Although only Salas was charged in the counts associated with the Vega shooting, those events were admissible against Garnica under section 1101, subdivision (b), as we have concluded above. As a result, none of the circumstances listed above as a basis for severance were present in this case at the time of the court's severance ruling. Moreover, even in retrospect, we discern no "gross unfairness" that denied Garnica due process.

Garnica responds with what boils down to two arguments. First, he contends that the trial court's ruling was erroneous under the multifactor test for severing *counts* under section 954 because (1) the Vega shooting is not cross-admissible against

14

him, (2) the Vega shooting was likely to inflame the jurors against him, and (3) the Vega shooting was designed to compensate for the People's weak case on the Saticoy shootings and forced tattooing of Covarrubias.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1314-1315.)  We reject this contention.  To begin, it is far from clear that section 954's multifactor test for severing *counts* applies under section 1098 for severing *defendants*.  However, even if we assume that section 954's test applies, we have concluded that all of the evidence admissible against Salas is also admissible against Garnica, and it is well settled that the "[c]ross-admissibility of evidence is sufficient . . . to deny severance" under section 954. (*People v. Ochoa* (2001) 26 Cal.4th 398, 423 (*Ochoa*).)  Second, Garnica urges that the trial court's ruling was deficient because the court did not analyze the section 954 factors on the record.  Even assuming (once again) that those factors are relevant, we review the trial court's ruling—not its reasoning—so the absence of an on-the-record analysis is of no consequence.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1155 (*Carter*) [so holding].)

### B. *Severance of counts against Salas*

As pertinent here, a trial court may join for trial "two or more different offenses of the same class of crimes or offenses" or "two or more different offenses connected together in their commission" unless the court "in its discretion" finds, on the basis of "good cause shown," that severance of the offenses is nevertheless "in the interests of justice."  (§ 954.)  Here, the crimes charged for each of the three incidents—murder, attempted murder, torture, aggravated mayhem and kidnapping—are all assaultive crimes, and hence crimes of the "same class."  (*People v. O'Malley* (2016) 62 Cal.4th 944, 967;

15

*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1243.) The crimes charged are also "'connected together in their commission'" because, as discussed below, they are "'linked by a "'common element of substantial importance'""'", which includes having the same intent or motive. (*People v. Landry* (2016) 2 Cal.5th 52, 76; *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1219 (*Alcala*).) Thus, severance is required only if the defendant makes a "'clear showing of prejudice'" arising from joinder—either under the information available at the time the severance request is denied or if, in retrospect, the joinder actually resulted in "gross unfairness" amounting to a denial of due process. (*People v. Armstrong* (2016) 1 Cal.5th 432, 456; *People v. Simon* (2016) 1 Cal.5th 98, 122.)

The trial court did not abuse its discretion in determining that defendant had not made a clear showing of prejudice at the time of its ruling. (*People v. Merriman* (2014) 60 Cal.4th 1, 37-38.) In assessing whether severance of counts is compelled under section 954, courts examine whether "'(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; [and] (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges.'" (*People v. Kraft* (2000) 23 Cal.4th 978, 1030.)[5] Here, the evidence as to the Saticoy Street shootings, the Vega shooting, and the

---

[5] Courts will also examine a fourth factor—namely, whether "'any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.'" (*Ibid.*) But that factor is not implicated in this case.

16

forced tattooing of Covarrubias is cross-admissible, as the evidence of Salas's gang motivation underlying each incident was relevant to prove that same intent and motive for the gang allegations charged as to each incident. Further, the facts of the Saticoy Street shootings and the Vega shooting are sufficiently similar—Salas in each case was dropped off, approached the victim(s) on foot with back-up from other gang members, fired his weapon, and then fled on foot to a waiting car—to establish intent to kill as to those two incidents. As noted above, such cross-admissibility is sufficient by itself to deny severance. (*Ochoa, supra,* 26 Cal.4th at p. 423.) None of these incidents is any more inflammatory than the others; all are grave and horrific acts resulting in death or mutilation. And we do not view the evidence supporting Salas's guilt for each of these incidents as "weak": He was seen on video approaching Saticoy Street moments before the shooting, Googled for police reports of the incident hours later, and even admitted shooting someone; he had Ramirez drive him to Vega's house, Googled for police reports of the incident hours later, and even admitted to shooting Vega; and he was on cell phone video holding a gun in Covarrubias's mouth while another gang member tattooed her.

Nor do we conclude that, in retrospect, the joinder of these incidents—all gang-related and within five months of one another—was grossly unfair as to deny Salas due process.

Salas responds with four arguments that we have not already addressed above.

First, he contends that the events are too far apart in time. We disagree. The Saticoy Street shootings and the Vega shooting are four months apart; the Vega shooting and the forced tattooing

17

of Covarrubias are four days apart.  These events are not so temporally remote as to compel severance.

Second, Salas asserts that the three incidents are not cross-admissible to prove motive or intent because they are not sufficiently similar because (1) they occurred at different times and places, (2) they involved different victims, including victims who belonged to different rival gangs, and (3) Salas acted with a different motive in each incident.  Because the issues of intent and motive were "essentially undisputed" at trial, Salas continues, the incidents were only admissible to prove his identity, and the degree of similarity required for cross-admissibility to prove identity is exacting and is not met here.  Evidence of a gang motive is, Salas continues, not enough to allow for cross-admissibility; for support on this point, he cites *People v. Williams* (1997) 16 Cal.4th 153, 193 (*Williams*); *People v. Cox* (1991) 53 Cal.3d 618, 660 (*Cox*); and *Williams v. Superior Court* (1984) 36 Cal.3d 441, 453, superseded by statute as stated in *Alcala, supra,* 43 Cal.4th at p. 1229, fn. 19.  We disagree.  For the reasons discussed above with regard to Garnica's evidentiary challenges, the various incidents *are* sufficiently similar to be cross-admissible on the issues of Salas's intent to kill as to the Saticoy Street shootings and the Vega shooting as well as his intent to aid the gang and his motive as to all three incidents:  In the two shooting incidents, Salas made gang-related challenges, was dropped off and approached his victim(s) on foot, was accompanied by other gang members, opened fire on his victims, and fled to a waiting car.  Salas also disputed the issues of his intent to kill at trial when he denied having anything to do with the shootings or tattooing, and claimed that the Vega shooting was a wholly personal matter rather than a gang-motivated

18

event. And the cases Salas cites—*Williams*, *Cox*, and *Williams v. Superior Court*, *supra*, 36 Cal.3d 441—held that evidence of a defendant's gang membership was inadmissible to prove guilt by association; none of those cases involved a gang enhancement, where proof of gang association is an element. Because that enhancement was alleged as to all three incidents here, Salas's gang motivation was cross-admissible as to all three incidents.

Third, Salas posits that (1) each incident was inflammatory in its "own unique way" because (a) the Saticoy Street shootings involved shooting at bystanders, (b) the Vega shooting involved shooting someone in his home, and (c) the Covarrubias incident involving kidnapping and forced tattooing; and (2) there was danger of a spillover effect because (a) no one saw Salas fire a gun during the Saticoy Street shootings or the Vega shooting, (b) no physical evidence tied Salas to those shootings, and (c) the only witness as to the Vega shooting was Ramirez, who was a weak witness. These further factors are irrelevant because, as noted above, the evidence between the incidents is cross-admissible and that, by itself, is sufficient for denying severance. Moreover, the incidents were inflammatory to the same degree—two were murders and attempted murders, and the third involved kidnapping with forced mutilation. (Accord, *Kraft*, *supra*, 23 Cal.4th at pp. 1029-1031 [joinder of 16 murder counts, with some involving strangulation, some involving sexual activity, and some involving mutilation; not sufficiently inflammatory to warrant severance]; *Alcala*, *supra*, 43 Cal.4th at p. 1227 [joinder of five murders with underlying sexual assaults; not sufficiently inflammatory to warrant severance].) We also reject that any spillover effect justified severance. Contrary to what Salas argues, we conclude that the evidence against Salas

19

as to all three incidents was compelling: Salas admitted to fellow gang members that he had engaged in the Saticoy Street shootings and the Vega shooting, and he was on video forcing Covarrubias to remain still while she was tattooed.

Lastly, Salas notes that the trial court did not spell out its analysis on the record. As noted above, this is not a basis for reversal where, as here, the trial court's ultimate ruling is correct. (*Carter*, *supra*, 36 Cal.4th at p. 1155.)

## III. Prosecutorial Misconduct

Garnica and Salas argue that the trial court violated their due process rights by denying their motion for mistrial after the prosecutor elicited an in-court identification of both defendants as shooters during the Saticoy Street shooting, while knowing that the identification was false. Because this is a constitutional issue, our review is de novo. (*In re Taylor* (2015) 60 Cal.4th 1019, 1035.)

### A. *Pertinent facts*

Maria Josefina Marron Gonzalez (Marron) lived on Saticoy Street on the date of the Saticoy Street shootings.

The next day, her son thought that the shooter looked a lot like one of his former high school classmates, Andrew Pinedo (Pinedo). The son pulled down a photograph of Pinedo from Facebook, and showed it to Marron. She told her son Pinedo was the man in a white t-shirt (of the two men she saw) that she saw running down the sidewalk across the street immediately after she heard gunshots. When questioned by Detective Ryan Verna (Det. Verna) a few days later, Marron affirmed that Pinedo was the shooter and, after that, picked him out of a photospread.

After police investigation determined that Pinedo was not the shooter, Marron still insisted that he was. When Det. Verna

20

showed her a photograph of Salas, she said he was *not* the shooter.

The People called Marron as a witness at the trial. During a break in her testimony, she told the prosecutor that *the two men she saw in the courtroom* (Salas and Garnica) were the shooters. The prosecutor immediately told Salas's and Garnica's attorneys. The prosecutor shared his view that Marron's revelation that Salas and Garnica were the shooters was "very inconsistent with the evidence" and was not "accurate." However, the prosecutor sought to elicit the in-court identification—not to prove it was true—but instead to show that Marron's prior identification of Pinedo was unreliable because "you put two people in front of [Marron] she's going to I.D. them."

When Marron resumed testifying, she identified Salas and Garnica as the shooters and, inconsistently, testified that only one of them had a gun. She also disavowed that she ever told her son—or Det. Verna—that Pinedo was the shooter. She also testified that she told Det. Verna that *Salas* was the shooter when he showed her a photograph of him. Inconsistently, Marron also denied ever being shown photographs *of anyone* between 2015 and 2019.

Garnica and Salas moved for a mistrial on the ground that the prosecutor had knowingly elicited false testimony. The trial court denied the motion, finding that the prosecutor had elicited the in-court information—not as proof of the shooters' identity—but rather to show that Marron's prior identification of Pinedo was tainted by Marron's willingness to implicate anyone presented to her as possibly involved. The court invited the parties to submit an instruction on this point, but neither Salas nor Garnica did so.

21

The prosecutor thereafter called Det. Verna as a witness to testify that Marron *had* identified Pinedo as the perpetrator and that she had said Salas was *not* the shooter.

In his initial closing argument, the prosecutor argued that Marron's initial identification of Pinedo happened after her son "show[ed] [her] a photograph of a guy in a white shirt . . . with a gun," that Marron was not "able" "to make an identification" of the shooter(s) from her vantage point, and that "no identifications could have been made that night."

The prosecutor noted that Marron's in-court identification of Salas and Garnica was made "[u]nder a very highly suggestive environment," and continued:

> "I'm not saying . . . Miss Marron is a vindictive person or she's a bad person. I think she's a very helpful person and she wants to help out and . . . she will choose anyone who is front of her and say that's the guy who did it and that's what you all saw here directly when she made those in-court identifications. She wants to help out but that doesn't make it right. There have been no good identifications made in the [Saticoy Street] murder in terms of the actual shooters on that night of people who were strangers."

In his rebuttal argument, the prosecutor again emphasized that Marron identified Pinedo simply because a "single photograph" was placed in front of her.

B.   *Analysis*

Due process prohibits a prosecutor seeking a criminal conviction to "'present evidence [he or she] knows is false'" and obligates the prosecutor to "'correct any falsity of which it is aware in the evidence . . . present[ed], even if the false evidence

was not intentionally submitted.'" (*People v. Morrison* (2004) 34 Cal.4th 698, 716, quoting *People v. Seaton* (2001) 26 Cal.4th 598, 647; see generally, *Napue v. Illinois* (1959) 360 U.S. 264, 265, 269.) However, due process does *not* prohibit the introduction of evidence the prosecutor knows to be false if the evidence is not presented as if it were true; in other words, due process is not offended where the prosecutor elicits testimony he or she knows to be false, tells the jury it is false, and uses that falsity to prove some other point. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1192-1195; *People v. Marshall* (1996) 13 Cal.4th 799, 829-830.) This makes sense, as parties are generally allowed to impeach their own witnesses (Evid. Code, §§ 780 & 785) and a jury is not deceived by false testimony if it is told the testimony is false.

The trial court did not err in denying the mistrial motions in this case. Although the prosecutor knew that Marron's in-court identifications of Salas and Garnica were false, he told the jury as much when he (1) called Det. Verna to contradict Marron's disavowal of her earlier identifications, and (2) argued to the jury that "no identifications could have been made" on the night of the Saticoy Street shootings and that her in-court identifications of Salas and Garnica were a product of her penchant for "choos[ing] anyone who is front of her and say that's the guy who did it," such that Marron's earlier identification of Pinedo was equally suspect.

Defendants respond with three arguments.

First, they argue that there is no exception to the general prohibition on eliciting false testimony because that prohibition, according to the pertinent case law, "applies even if the false or misleading testimony goes only to witness credibility."

23

(*Morrison*, *supra*, 34 Cal.4th at p. 717; *Napue*, *supra*, 360 U.S. at 269.)  The argument misreads this language.  What this language means is that a prosecutor cannot elicit false testimony, while passing it off as true, in order to make a witness appear more or less credible.  Where, as here, the prosecutor tells the jury that the false testimony is false, there is no violation of due process.

Second, defendants argue that the prosecutor was not explicit enough in advising the jury that Marron's in-court identification was false because he did not tell the jury something akin to, "She just committed perjury."  What the prosecutor said here in his initial closing argument was sufficient because it made clear that Marron's in-court testimony was *not* consistent with the evidence and was the product of her willingness to identify anyone, at any time.  This view was reinforced by the prosecutor's decision to recall Det. Verna to impeach Marron's disavowal of her prior identifications of Pineda.  (Cf. *United States v. LaPage* (9th Cir. 2000) 231 F.3d 488, 490-491 [prosecutor argues witness's testimony is true in initial closing argument and waits until rebuttal closing argument to argue that testimony is false; due process violated].)

Lastly, defendants argue that the trial court did not give an instruction telling the jury not to consider Marron's in-court identification as being true and that, absent such an instruction, the jury was still free to do so.  As a threshold matter, the trial court invited defendants to submit a limiting instruction and they evidently declined to do so.  There was no error in any event. No one argued that the in-court identification was accurate and, in fact, everyone argued that it was *inaccurate*.  On such facts, there was no need for an instruction and any error in failing to

24

give one was necessarily speculative and hence harmless beyond a reasonable doubt.[6]

## IV. Review of *In Camera* Discovery

Salas's trial counsel made a pretrial motion to discover the prosecution witnesses' unredacted personal information. The prosecutor opposed the request. The trial court conducted an in camera, ex parte hearing, and ruled that the names of witnesses would be provided to all defendants' attorneys, but that the other contact information and personal identifying information did not have to be disclosed. Salas requests that we independently review the sealed reporter's transcripts of the trial court's in camera hearing to determine whether the trial court erred and violated his due process rights.

The names and addresses of prosecution witnesses are subject to disclosure under section 1054.1, but section 1054.7 gives the trial court discretion to deny, restrict, or defer such disclosure for good cause. Good cause includes "threats or possible danger to the safety of a victim or witness." (*Ibid.*) A showing of good cause may be made in camera, and a "verbatim record" of the in camera hearing must be made available on appeal. (*Ibid.*)

Orders under section 1054.7 are subject to review for abuse of discretion. (*People v. Williams* (2013) 58 Cal.4th 197, 263 [good cause based on evidence that witness's life had been threatened and detective declared disclosure would compromise witness's safety and integrity of investigation]; *People v. Panah*

---

[6] In light of our conclusion, we have no occasion to address the People's argument that defendants forfeited this issue entirely by not seeking an instruction admonishing the jury.

(2005) 35 Cal.4th 395, 458 [good cause based on credible allegations defendant had conspired to kill witness].)

Having conducted a "careful review" of the in camera hearing (*People v. Webb* (1993) 6 Cal.4th 494, 518), we find no error in the trial court's determination that redaction of the contact information and personal identifying of the witnesses was necessary.

## V.    Cumulative Error

Because we reject defendants' individual claims of error, we necessarily conclude there was no cumulative error.  (Accord, *People v. McWhorter* (2009) 47 Cal.4th 318, 377 [no cumulative error where no individual error exists].)

## VI.    Sentencing Issues

Salas and Garnica argue that the recent enactment of Assembly Bill No. 333 and Assembly Bill No. 518 require that portions of their sentences be vacated.  Because this issue entails questions of retroactivity and the application of the law to undisputed facts, our review is de novo.  (*In re Marriage of Fellows* (2006) 39 Cal.4th 179, 183 [retroactivity]; *Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1018 [law to undisputed facts].)

### A.    *Pertinent facts*

#### 1.    *Salas's sentence*

As to Salas, the trial court imposed a determinate prison sentence of 15 years, followed by two sentences of life without the possibility of parole (LWOP), followed by 187 years to life.  The court calculated this sentence as follows:

* For the murder during the Saticoy Street shooting, the trial court imposed a sentence of LWOP plus 25 years, with the LWOP sentence based on the special circumstance that Salas

26

"intentionally killed [the victim] while [Salas] was an active participant in a criminal street gang and the murder was carried out to further the activities of the criminal street gang" (§ 190.2, subd. (a)(22)), and with the 25-year enhancement based on the use of a firearm by a principal in a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang" (§§ 12022.53, subds. (d), (e)(1), 186.22, subd. (b)).

● For each of the three attempted murders during the Saticoy Street shooting, the trial court imposed a base sentence of 15 years to life plus a 25-year enhancement based on the use of a firearm by a principal in a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang" (§§ 12022.53, subds. (d), (e)(1), 186.22, subd. (b)).

● For dissuading a witness in the course of the Saticoy Street shooting, the court imposed a sentence of seven years to life.

● For being a felon in possession of a firearm during the Saticoy Street shooting, the court imposed a determinate sentence of two years, but stayed the sentence pursuant to section 654.

● For the murder during the Vega shooting, the court imposed a sentence of LWOP plus 25 years, with the LWOP sentence based on the special circumstance of committing "more than one offense of murder in the first or second degree" (§ 190.2, subd. (a)(3)) and the special circumstance that Salas "intentionally killed the victim while [Salas] was an active participant in a criminal street gang . . . and the murder was carried out to further the activities of the criminal street gang" (§ 190.2, subd. (a)(22)), and with the 25-year enhancement based on

27

Salas's "personal" discharge of a firearm causing death (§ 12022.53, subd. (d).

- For the conspiracy to commit murder regarding the Vega shooting, the court imposed a sentence of 25 years to life but stayed the sentence pursuant to section 654.

- For the kidnapping of Covarrubias, the court imposed a sentence of 15 years, comprised of a five-year base sentence plus 10 years based on the use of a firearm by a principal in a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang" (§§ 12022.53, subds. (d), (e)(1), 186.22, subd. (b)).

- For the torture of Covarrubias during the forced tattooing, the court imposed a life sentence plus 10 years, with the 10 years based on the use of a firearm by a principal in a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang" (§§ 12022.53, subds. (d), (e)(1), 186.22, subd. (b)).

- For the aggravated mayhem during the forced tattooing of Covarrubias, the court imposed a sentence of life plus 10 years, but stayed the sentence pursuant to section 654.

      b.    *Garnica's sentence*

As to Garnica, the trial court imposed a sentence of 125 years to life. The court calculated this sentence as follows:

- For the murder during the Saticoy Street shooting, the trial court imposed a base sentence of 25 years to life plus an additional 25 years to life based on the use of a firearm by a principal in a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang" (§§ 12022.53, subds. (d), (e)(1), 186.22, subd. (b)).

28

- For each of the three attempted murders during the Saticoy Street shooting, the trial court imposed a base sentence of life plus a 25-year enhancement based on the use of a firearm by a principal in a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang" (§§ 12022.53, subds. (d), (e)(1), 186.22, subd. (b)).

B. *Analysis*

Effective January 1, 2022, the law affecting Salas's and Garnica's sentences changed. Assembly Bill No. 333 amended the definition of the term "pattern of criminal gang activity" to, among other things, now require proof of a benefit to the gang that is "more than reputational." (§ 186.22, subds. (e)(1), (g); compare *People v. Albillar* (2010) 51 Cal.4th 47, 63 [reputation injury *does* constitute a benefit to a gang].) Because the definition of a "criminal street gang" incorporates the definition of a "pattern of gang activity," Assembly Bill No. 333's amendment of that definition implicates not only the gang enhancement set forth in section 186.22, but also the firearm enhancement under section 12022.53, subdivision (e)(1) and the special circumstance under section 190.2, subdivision (a)(22) that require proof of the involvement of a "criminal street gang." The People concede as much.

Because Assembly Bill No. 333, at a minimum, now requires the People to prove elements (such as a benefit to the gang that is "more than reputational") that were not previously required, it is an ameliorative statute that applies retroactively to cases—like Salas's and Garnica's—that are not yet final on appeal. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 300 [so holding]; see generally, *In re Estrada* (1965) 63 Cal.2d 740, 748-

29

750.)  Again, the People concede as much (at least as to these definitional changes).

Because the People did not ask the jury to find at least some of the elements that Assembly Bill No. 333 requires (and that the prior law did not require), the enhancements affected by that new law must now be vacated.  (Accord, *People v. Sengpadychith* (2001) 26 Cal.4th 316, 325-326.)  Here is a list of the enhancements that must now be vacated:

●      The special circumstance finding accompanying Salas's murder conviction arising out of the Saticoy Street shooting, because that finding rests solely on the definition of a "criminal street gang" (under section 190.2, subd. (a)(22)).

●      The firearm enhancements based on the use of a firearm by a principal in a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang" (§§ 12022.53, subds. (d), (e)(1), 186.22, subd. (b))—which were imposed as part of the sentences for (1) Salas's and Garnica's attempted murder convictions arising out of the Saticoy Street shooting, (2) Garnica's murder conviction arising out of the Saticoy Street shooting, (3) Salas's conspiracy to commit the Vega murder (although it was stayed), and (3) Salas's convictions for torture, aggravated mayhem and kidnapping arising out of the forced tattooing of Covarrubias (although the enhancement for aggravated mayhem was stayed).[7]

The LWOP plus 25 years sentence for Salas's murder conviction during the Vega shooting is unaffected by Assembly Bill No. 333 because there is an independent basis for the imposition of the special circumstance (i.e. due to multiple

---

[7]      Although several gang enhancements were charged under section 186.22, the trial court struck all of them.

30

murders) and because the firearm enhancement was based on Salas's *personal* discharge of a firearm

Because the elements newly required by Assembly Bill No. 333 were "never tried" to the jury, the People should be given the opportunity to decide whether to retry the affected enhancements to a jury. (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 72, fn. 2.) We remand to give the People the opportunity to make that decision.

Salas and Garnica also urge us to remand to permit the trial court to exercise its discretion—newly conferred by Assembly Bill No. 518—to decide which counts to stay under section 654. The People urge us to specify to which counts that discretion may apply. We decline to enter that fray. By virtue of our ruling regarding Assembly Bill No. 333's effect on defendants' sentences, the trial court will have to resentence defendants. That will be a full resentencing. (E.g., *People v. Walker* (2021) 67 Cal.App.5th 198, 201, 204.) At that time, the trial court can consider the full range of options under the law as it exists on the date of resentencing, which will include the changes wrought by Assembly Bill No. 518. We decline to intervene when the trial court has yet to act.

31

## DISPOSITION

The judgments are vacated.  The convictions are affirmed, but the sentences are vacated and remanded for further proceedings to enable the People to elect whether to retry the enhancements and special circumstance affected by Assembly Bill No. 333.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.

HOFFSTADT


We concur:


_____, P. J.

LUI


_____, J.

ASHMANN-GERST

32